## FITCH *et al.* v. REISER.

**Deed: UNDUE INFLUENCE: PRESUMPTION.** Where a man over eighty years old, and of feeble mind, deeded, substantially, all of his property to his daughter, to whom alone he looked for advice, and whose control of him was absolute, and the deed was without consideration, *held*, in an action by the other heirs to set it aside, that it was incumbent upon the daughter, in order to sustain the deed, to show that it was made voluntarily, and without the exercise of any influence on her part, or in her behalf, to procure the same. (Compare *Leighton v. Orr*, 44 Iowa, 679; *Spargur v. Hall*, 62 Iowa, 498.)

*Appeal from Chickasaw District Court.*—HON. L. O. HATCH, Judge.

FILED, JANUARY 22, 1890.

THIS is an action in equity by which the plaintiffs seek to set aside and annul a deed of certain real estate which was executed by James D. Fitch to the defendant, Martha M. Reiser. The plaintiffs and the defendant are the children of said Fitch. Upon a final hearing upon the merits the district court granted the prayer of the petition, and annulled the deed. Defendant appeals.

*J. H. Powers*, for appellant.

*J. W. Sandusky*, for appellees.

ROTHROCK, C. J.—James D. Fitch owned and for many years resided upon a farm of about one hundred acres in Chickasaw county. He was the father of the parties to this action. His wife died on the thirteenth day of September, 1886. On the twenty-first day of the same month he made the deed in question, by which he conveyed his farm to his daughter, the defendant in this action. He died on the twenty-sixth day of September, 1887, at the advanced age of nearly eighty-three years. He was a man of no education, as the term is commonly used. He was several years older than his wife, and the evidence shows that for many years prior to her death he consulted and advised with her about all of his business transactions, even to matters of the most trifling character. The loss of his wife was a great calamity to him. His children were all married, and at the time of his wife's death the daughter of the defendant, aged about thirteen, was the only member of the family. He and his wife had taken this child when she was quite young, and she remained with them as long as they lived. The defendant and her husband resided on one corner of the farm at the time of the death of the father and mother. It is claimed by the plaintiffs that the deed should be cancelled upon two grounds: (1) Because of the mental incapacity of James D. Fitch to make a valid conveyance; (2) because

of undue influence exercised by the defendant over her father, which, in his weakened mental condition, induced him to make the deed.

The cause is to be determined upon the preponderance of the evidence upon these questions, and there is a marked conflict in the testimony of the witnesses upon the issue as to the mental capacity of the deceased at the time he executed the deed. One thing, however, is abundantly established, and that is that, by reason of the dependence of the deceased upon the advice and direction of his wife, her death was a greater bereavement to him than it otherwise would have been. The story of his lamentations over her death, as detailed by the witnesses, is a most pathetic delineation of the crushing and overwhelming sorrow of an aged man at the loss of the partner of his joys and sorrows through a long and happy married life. It was perfectly natural that he should seek counsel and advice of others, and the evidence conclusively establishes the fact that, after the death of his wife, he put himself under the care and control of his daughter, the defendant. Her power over him appears to have been as absolute as that of the mother during her life; and this dependence upon the defendant and her control over him were manifest at once upon the death of the mother.

To show the extent of this influence, we will here quote quite extensively from the testimony of Samuel D. Kenyon, cashier of the First National Bank of New Hampton, as to a business transaction he had with the deceased on the twenty-sixth day of November, 1886. The testimony of the witness is as follows: "Mr. Fitch held two interest-bearing certificates of deposit. One of them was for one hundred and seventy dollars; the other, for one hundred and eighty dollars. Both were due. He presented them for payment, but finally took payment in a new certificate of deposit ($300), running to Emma Reiser, and the balance, of fifty dollars and interest, he took in cash. Mrs. Reiser took a very important part in the transaction. She did nearly all

of the talking for Mr. Fitch, and directed the manner in which the transaction should be closed. When the parties came into the bank Mr. Fitch did not have personal possession of the certificates of deposit, but Miss Emma Reiser, who was one of the parties, had them in a little hand-bag. Mr. Fitch stepped to the counter, and said he came after his money. Mrs. Reiser then said: 'No, pa; you do not want the money; you want it just as we talked.' She then turned to her daughter, Emma Reiser, and received from her the two certificates of deposit, and told me that her father desired to put three hundred dollars of that money in the name of Emma Reiser, his granddaughter. The balance they wanted in cash. After some talk between Mrs. Reiser and Mr. Fitch, he said that was right. The certificate and nearly all the money she gave to her daughter, who put it in her hand-bag. She gave Mr. Fitch only a small portion of the money. The money was laid on the counter in front of Mr. Fitch, and Mrs. Reiser took possession of it. Mr. Fitch had no opportunity to count over the money, as Mrs. Reiser at once took possession of it. I think I can describe Mrs. Reiser's conduct. Mrs. Reiser was very careful that her father should not do much talking. Nearly always when he would commence to say anything she would interrupt him, and herself would make a declaration of what he wanted to say, generally concluding with the remark: 'Now, that is right, ain't it, pa?' or, 'you know that's right;' or something similar. The conversation between Mrs. Reiser and myself was quite lengthy, and embraced other matters than those I have mentioned, but all pertaining to her father and his business. She never permitted Mr. Fitch to offer any suggestions or direction as to the business, or how it should be concluded. She herself assumed the sole direction of the whole matter. I was impressed with her peculiar manner towards her father in this business transaction. During late years I have transacted business with Mr. Fitch and his wife. At such times Mrs. Fitch took an active

part in such business transactions. She always controlled and directed the transactions. I think I never had any business with Mr. Fitch alone. His wife would always come with him, and look after the business. There were times when he would come into the bank alone with a certificate of deposit for renewal or payment, but would never close the transaction alone, but would wait for his wife to come in and see to it. At the time Mr. Fitch was in the bank with Mrs. Reiser he was controlled and influenced by her absolutely; that is, so far as the business transaction involved at the time, which she absolutely directed and decided, without permitting him to express his opinion on the matter at all. He followed her direction, and acceded to her request, and complied with her orders and commands, regarding this whole business transaction in this way. He assented to them in this way. She would always close her statement with some appeal to him, such as: 'Now, you know what you want, pa;' or, 'that is right, pa, ain't it?' or words similar in meaning. Mrs. Reiser first mentioned or suggested that three hundred dollars then due Mr. Fitch should be deposited in the name of Mrs. Reiser's daughter Emma. I think it was in response to a question to Mr. Fitch as to what disposition should be made of the certificate. He made no reply to the question, as she did not permit him to, as she answered for him. He made no direction whatever that the certificate should be issued to Emma Reiser, but Mrs. Reiser gave the only directions that were given, but always concluding with some statement to her father, as, 'Now, that is right, ain't it, pa?' or words to that effect. He had not then, nor has he since, had any money in the bank. The Emma Reiser, to whom the three-hundred-dollar certificate of deposit was issued, was the daughter of the defendant, who lived with Mr. Fitch."

We have set out this evidence for the purpose of showing the absolute control which the defendant had of her father. We do not wish to be understood as

condemning the defendant for acting as an aid and adviser to her father ; but a contract or conveyance made by one to a person sustaining such relations of trust and confidence is in equity regarded in a different light from a conveyance between persons where no such trust and confidence exist.

There is much controversy between counsel as to the effect of the evidence upon the mental condition of Mr. Fitch at the time the conveyance was made. The witnesses for the defendant testify that his mind was sound, and they give instances of business transactions made by him without assistance, in which he acted intelligently. On the other hand, there are a number of witnesses in behalf of the plaintiffs who testify to many acts which indicate, not only mental weakness caused by extreme old age, but tend to show a lack of capacity to transact any business. One witness, who does not appear to be related to the parties, and who has no interest in the controversy, testified that he farmed the place for four years, from 1881 to 1884, inclusive ; that he lived on the place during those years, and passed through the door-yard of Fitch's house almost daily, and was intimately acquainted with him. He met him in October, 1886, and Fitch did not know him. This witness says : "The deceased walked around the house [the home of witness] twice, and finally said : 'I can't find the way out.' He could not find the road he came in on. I went with him to where his son was putting up hay. The path on which he came was easy to find. It came straight into the door into which he came. He did not act as he did when I was on the place. His mind seemed to be affected. He repeated a story to me about his dog having killed sheep, and repeated it three times within one hour."

We are not prepared to say that the evidence in the case shows an absolute want of mental capacity to make a testamentary disposition of property. But in consideration of the extreme mental weakness of the deceased at the time the deed was executed, and as the

property in controversy embraced substantially all of his estate, and as the deed was without consideration, and in view of the relations of trust and confidence between the parties to the conveyance, we think the learned district judge was right in entering a decree annulling the deed. The control of the defendant over the deceased appears to have been absolute. Under such circumstances it was incumbent on the defendant to show that the conveyance was made voluntarily, and without the exercise of any influence on her part or in her behalf to procure the same. See *Leighton v. Orr*, 44 Iowa, 679; *Spargur v. Hall*, 62 Iowa, 498, and Kerr, Fraud & M. 150–152. The decree of the district court will be                                          AFFIRMED.