LEWIS WAHL, Appellee, v. FRED S. TAYLOR, Appellant.

**FRAUDULENT CONVEYANCES:** Action to Cancel—Evidence.
1 Evidence reviewed, and held sufficient to justify a decree setting aside a conveyance obtained by grantee, who falsely assumed to be the grantor's counselor, friend and protector.

**EVIDENCE:** Burden of Proof—Fiduciary Relation—Conveyances—
2 Consideration. One who occupies the relation of counselor, friend and protector to another, and by means of such relation obtains from such other a conveyance, has the burden of proof to show that he paid due consideration therefor.

**FRAUDULENT CONVEYANCES:** Action to Cancel—Action by
3 Grantor Participating in Fraud. The rule that a grantor who conveys his property to defraud his creditors cannot, in equity, recover the property from the grantee, even though there was no consideration, applies only when there is actual—intentional—fraud on the part of the grantor.

**FRAUDULENT CONVEYANCES:** Action to Cancel—Defense—
4 **Parol Express Trust.** One who, through an abuse of the confidence rightly but mistakenly reposed in him by another, fraudulently obtains from such other a conveyance of land, will not, in an action by his victim to cancel the conveyance, be permitted to find safe refuge behind the claim that nothing arose more than an express trust, unprovable because not in writing.

*Appeal from Washington District Court.*—JOHN F. TALBOTT, Judge.

SATURDAY, MAY 13, 1916.

ACTION to set aside a conveyance of real estate on the ground of fraud. Opinion states the facts. Decree for the plaintiff in the court below. Defendant appeals.—*Affirmed.*

*Brookhart Bros.,* for appellant.

*Eicher & Livingston,* for appellee.

GAYNOR, J.—On the 21st day of February, 1913, and prior thereto, plaintiff was the owner of two certain tracts of land, which, for convenience, we will call the 10-acre tract and the 12-acre tract, and on said day conveyed the same to the defendant by warranty deed. He brings this action to set aside this conveyance, on the ground that it was procured by fraud and undue influence practiced and exercised by the defendant in securing the same. He alleges further that no adequate consideration passed to the plaintiff therefor. The defendant denies all fraud, and claims that the conveyance was obtained and made in good faith, and for a valuable consideration; alleges, further, that plaintiff's purpose in making the deeds was to place the title beyond the reach of his creditors, and was fraudulent so far as the plaintiff was concerned, and that he is now estopped to assert any right or title to the land so conveyed. Upon the issues thus tendered, the cause was tried to the court, and decree entered for the plaintiff. From this, defendant appeals.

1. FRAUDULENT CONVEYANCES: action to cancel: evidence.

The case is triable *de novo,* and not upon error. It becomes our duty, therefore, to review the whole record, and determine the case upon its merits. Alleged errors will not be considered, except in so far as they affect the final result and prevent us from reaching a fair and equitable conclusion upon the facts and the law.

Antedating the transaction here complained of, it appears that, in the fall of 1912, the plaintiff contracted to buy 214 acres of land from one Flarity at $137.50 per acre, and agreed to close the deal the first of March, 1913. It appears that the plaintiff was practically a poor man—a mail carrier by occupation—with little practical business experience; that, about the time he entered into this contract to purchase, he had an arrangement with one Amlong by which Amlong agreed to take 80 acres of the land so purchased. By this, the plaintiff expected to meet the obligations of his contract with Flarity when it matured. However, after plaintiff purchased the land, Amlong refused to take any portion of it. This left plaintiff in a somewhat embarrassing position. It seems that the contract with Flarity provided for a penalty of 10 per cent. of the contract price as a forfeiture, in the event that plaintiff failed to perform the contract according to its terms. Thereupon, plaintiff, to relieve himself from his embarrassment, sought out and consulted certain real estate agents in his town, and tried to secure their services to make disposition of the land for him before the obligations under his contract matured. By this, he thought to meet his contract and avoid the penalty that might be exacted of him. Among the real estate men, he met the defendant, and placed the matter before him and undertook to secure his services to dispose of this land. This was in the month of December, 1912, or January, 1913.

Defendant was an active and energetic business man, with considerable experience in the business world. He immediately proceeded to inform the plaintiff, with apparent candor, that he would find great difficulty in disposing of the land at the

price at which it was purchased; that he had contracted to pay too much for the land; that it would not be possible to dispose of it before the first of March. He then proceeded to tell the plaintiff, not only that the Flarity land was not worth what he had agreed to pay for it and could not be sold at that figure, but that Flarity was a hard man; that he had known Flarity for a great many years. He then examined the Flarity contract, and said that it looked to him as if Flarity, from the manner in which he tied the plaintiff up, intended to take this land; that Flarity was a skinner and a crook, and he knew it; that he knew that he was as crooked as he could be. He then told the plaintiff that he would better see Flarity and see if he wouldn't take it back. It appears that plaintiff then went to Flarity and found that Flarity had made such arrangements that he couldn't take the land back; that, a few days after that, a further talk occurred between the plaintiff and defendant. Defendant wanted to know if there wasn't someone to whom plaintiff could deed his property (being the property in controversy); wanted to know if plaintiff couldn't get someone to take his property so that Flarity couldn't get it; said that it looked to him as if Flarity was trying to get his other property, and said: "I am not going to let him do it if I can help it." Plaintiff told him that he didn't know of any way to keep Flarity from taking the property. He then told the plaintiff that he was too old a man to lose everything; that his boys needed what property he had; wanted to know if the plaintiff couldn't turn the property over to someone and save it for the two boys. Plaintiff told him that he didn't know of any person to whom he could transfer his other property. The defendant suggested some names. Plaintiff told him that that kind of business didn't look good to him; that it didn't look right; that he would rather make a square settlement with Flarity; that he would go to Flarity and see if Flarity would settle up; that he would go and talk the matter over with him. Again they met, and defendant said:

"Well, you are up against a hard proposition. I feel

sorry for you and will try to get you out of it in some way, and to see if there is not some way to keep Flarity from getting it.''

A few days later, the defendant called the plaintiff to his office. Plaintiff went. The defendant then proposed that the plaintiff deed the property to him, his 10 and 12 acres, and said that in this way he could keep Flarity from robbing him of the property that he already possessed. Defendant asked the plaintiff to give him the deed, put the thing in his hands, and ''let him crack the whip;'' and, thereupon, the plaintiff conveyed the property in question to defendant, and the defendant delivered to plaintiff two deeds—one to 60 acres of land in Missouri, executed by one Britton, and one to 39 acres of land in Minnesota, purporting to be executed by one Arne —and paid him $2 in cash. The deeds contained no grantees. They were both in blank. The deed from Britton was signed and acknowledged June 18, 1912. The deed from Arne to the Minnesota land was dated April 20, 1912. Plaintiff knew nothing of the character of the land described in these deeds; knew nothing of the persons who purported to be grantors in these deeds. The only abstract of title delivered at the time was an old abstract dated November 17, 1908, nearly four years before the deeds were executed. At the time these deeds were delivered, defendant did not insert plaintiff's name in the deeds as grantee, nor did the plaintiff subsequently enter his name as grantee. These deeds were not recorded at the time they were delivered to the plaintiff, nor have they since been recorded. If defendant's contention is true, the plaintiff accepted unrecorded deeds to land in distant states, without any knowledge of the character or quality of the land, without knowing whether the grantors named therein had any title to the land or not, without the name of any grantee inserted in the deeds, without an abstract showing the condition of the title at the time of the delivery, without any knowledge as to whether or not the grantors were financially responsible for their warranties, and without any fact, other

than the delivery of a naked piece of paper, showing that he was getting anything for the property conveyed to the defendant. It strikes the mind as rather extraordinary that a man possessing average business sense would dispose of property amounting to nearly $3,200 without any assurance from anybody that he was receiving anything in return therefor. We recite these facts, not because they are controlling, but as a strong sidelight exposing to view the true situation as it existed.

If plaintiff conveyed this property in question to defendant, in consideration of the receipt of these deeds and $2 in money, under the conditions exposed in this record, intending to part with his title to the land in question to the defendant in consideration thereof, he certainly needed a guardian. Under this record, the defendant gave the plaintiff no assurance that he was receiving anything for what he parted with, except these blank deeds, an abstract four years old, and $2 in money. Assuming that the burden was on the plaintiff to show that the consideration was inadequate, there is evidence to show that there were 60 acres in the Missouri tract; that it was not worth over $5 an acre; that there were 39 acres in the Minnesota tract; that it was not worth to exceed $5 an acre, making a total valuation of the land, provided the title was good and unencumbered, of $495. Defendant's testimony, however, tends to show that the land was worth $20 an acre, which would make the total consideration $1,980. The evidence shows, with absolute certainty, that plaintiff's property was worth practically $3,200 at the time of the conveyance; so, even under defendant's theory, there was a difference between the values of approximately $1,220 in defendant's favor—a profit which defendant claims legitimately to have made in his professed effort to serve the plaintiff as his friend, and defend him against the wicked Flarity.

It is profitless to review all the testimony here. It strongly savors of a direct and deliberate effort on the part of the defendant, under the guise of friendship, to circumvent

the plaintiff, to play upon his credulity and his fear.   There is nothing in the record to show that Flarity is other than an honest man.   The record does show that Flarity made no effort to circumvent the plaintiff; that the matter between Flarity and the plaintiff was settled amicably.   Flarity sought nothing under his forfeit, except the $500 already paid, and that much the plaintiff conceded to him.   There is nothing in the record to justify defendant's harsh language of and concerning Flarity.   We must assume that it was made for a purpose, and that the purpose has been accomplished so far.

In setting out the record here, we have taken the testimony that we believed to be true and reliable.   We are not bound to accept the testimony of any one witness as true. We accept the testimony of no witness as absolutely true in controversies of this kind, but look to the whole record, and judge the testimony from the standpoint of probability. That which is true ordinarily is reasonable and consistent with the usual and ordinary methods of men.   That which is false bears its own earmarks.

We hold that the defendant assumed the role of counsellor and friend, advisor and protector; pictured Flarity as a vulture, greedily waiting for the Ides of March, to pounce upon and destroy the plaintiff financially.   He thrust himself into the breach as an armored knight, eager and anxious to protect and defend plaintiff against the wily Flarity.   In his great tenderness and anxiety he professed to see and comprehend dire consequences to plaintiff's children.   He said to the plaintiff:

"You are too old a man to lose everything.   You owe it to your children to save what you have.   Flarity has bound you hand and foot.   Flarity is a vulture.   Your property is his prey.   Hide it.   Your only safety lies in that."

Fear was in the heart of the plaintiff.   He dropped that which he sought to save into the lap of the defendant, credulously relying on the defendant to return it to him when the vulture had ceased his vigilance of pursuit.   There was no

vulture pursuing the plaintiff. It was a creature of defendant's imagining, held up before the plaintiff for a sinister and wicked purpose. Thus the defendant "dropped off gorged from a scheme that left the plaintiff flaccid and drained." We are asked as a court of equity to aid the defendant to retain the fruits of his perfidy. This we cannot do.

It is clear from this record that the plaintiff regarded the defendant as his advisor and friend; one who was willing to stand between him and his improvised enemy; that the plaintiff reposed trust and confidence in him; and that the defendant abused this confidence. This record does not make it plain that the plaintiff received anything from the defendant as a consideration for this property. We are inclined to think that the rule is that, when it is shown that one has assumed to be the advisor and friend of another to act for him as his agent in the transaction of business, he owes the utmost good faith in the transaction. They no longer deal at arm's length. Where one takes from the other under such conditions, it is incumbent upon him to show that he gave a fair return. This the record does not show. In fact, it fairly negatives the idea that the plaintiff received from the defendant any consideration for his property.

2. EVIDENCE: burden of proof: fiduciary relation: conveyances: consideration.

The defendant invokes the rule that one who sells his property to defraud his creditors cannot in equity recover the property, even though there was no consideration. This rule is applied only when there is actual fraud, and is applied, not because it is right for the other to keep the property, but because courts of equity will not interfere to undo that which the other, in perpetrating the fraud, has brought upon himself. The record discloses no intentional fraud on the part of the plaintiff in this transaction, and we think none can be imputed to him from the facts disclosed.

3. FRAUDULENT CONVEYANCES: action to cancel: action by grantor participating in fraud.

It is urged by the defendant again that, even conceding

all that plaintiff claims, there arose nothing more than an express trust, which, not being evidenced in writing as required by statute, cannot be enforced in this action. We cannot answer this contention better than in quoting from *Schneider v. Schneider,* 125 Iowa 1, in which this language is used:

4. FRAUDULENT CONVEYANCES: action to cancel: defense: parol express trust.

''Where the relations of the parties, or the circumstances in which they are placed, are such that one of them, acting as a reasonable person, places special trust and confidence in the other, the latter cannot with impunity abuse that trust and confidence to his own profit. It is well settled that where it appears that a fiduciary or confidential relation existed between the parties at the time of the transaction alleged to be fraudulent, such as trustee and *cestui que trust,* principal and agent, attorney and client, husband and wife, guardian and ward, or where one of the parties for any other reason possesses influence or power over the other, the law raises a presumption of fraud whenever the party in whom the confidence is reposed obtains from the others a contract to his own profit. . . . The vital question is whether there was confidence reposed by one in the other, whether the party who alleges the wrong dealt with the other at arm's length, under circumstances where, as a reasonable person, she ought not to have been misled; or whether, having placed confidence in the other, either as a relative, friend or adviser, the other took advantage of her faith and dependence to enrich himself at her expense. If that fact be found, the court will not only refuse to enforce a contract thus wrongfully obtained, but will compel the wrongdoer to make restitution, where necessary to effect justice; and this it will do . . . because it is a fundamental principle in equity that one who has invited another to place confidence in him shall not be permited to profit by a betrayal of it.''

See, also, *Williams v. Collins,* 67 Iowa 413.

Upon the whole record, we think that the conclusion

reached by the trial court was a righteous and just conclusion.
The decree has our full and unstinted approval.   The decree
of the district court is therefore—*Affirmed.*

EVANS, C. J., LADD and SALINGER, JJ., concur.