JOSEPH WRIGHT et al., Appellants, v. H. F. ROHLING et al., Appellees.

**DEEDS:** Validity—Fraud and Duress.   Evidence reviewed, and held to show that certain preposterous and senseless threats, made to a weak and ignorant grantor by a grantee who had been grantor's counselor for years, was the moving cause for the execution of the deed of gift, and invalidated the same.

*Appeal from Pottawattamie District Court.*—O. D. WHEELER, Judge.

THURSDAY, JUNE 29, 1916.

SUIT in equity by Joseph Wright, plaintiff, to set aside a deed, on the ground that it was obtained by fraudulent representations and duress.   Trial being had on the merits, the petition of the plaintiff was dismissed, and he has appealed. —*Reversed*.

*Saunders & Stuart,* for appellants.

*Tinley, Mitchell & Pryor* and *John P. Organ,* for appellees.

EVANS, C. J.—The deed which is assailed herein was executed by the plaintiff and his wife on January 25, 1913. This suit was begun immediately thereafter, the petition being filed on February 6th. . The real estate consisted of a farm of 80 acres, which was occupied as a home by the plaintiff and his family. Plaintiff's family consisted of his wife and five children. The farm was of the value of $115 per acre at the time of such conveyance. It was encumbered by mortgages to the amount of $4,400, and was subject to a further equity of $1,800 for unpaid purchase money. The only purported consideration for the deed was the execution of a lease thereon by the grantee, Rohling, to the plaintiff and his wife, for a period of two years, rent free. At the time of such conveyance, the plaintiff was insolvent, and was threatened with suits of unsecured creditors and with bankruptcy proceedings. The petition avers that the plaintiff was induced by the defendant to execute such deed, by threats of criminal prosecution. There had been business relations between the parties for several years prior. The defendant Rohling was a member of a real estate and loan firm doing business at Council Bluffs. The defendant, or his firm, had financed the plaintiff in various transactions for some years. The farm in question was acquired by the plaintiff by purchase from his brother, Levi Wright, intervener herein, in March, 1912, at the price of $6,800. Prior to that time, he had owned and occupied another little farm, which he sold, at or about the time of the purchase from his brother of the farm now under consideration. The transaction of purchase between the plaintiff and his brother Levi was financed by the defendant in this wise: The first farm was already encumbered by a mortgage of $1,700, and the second farm by a mortgage of $2,300; the defendant procured for the plaintiff, in the form of loans, an additional credit of $1,000 on the first farm, and an additional credit of $1,700 on the second farm. In each case, the

*Margin note:* DEEDS: validity: fraud and duress.

previously existing mortgage was retired, and a new one was made to cover the amount thereof and the additional credit. The plaintiff, therefore, executed to the defendant, or his firm, a mortgage on the first farm for $2,700. As a bonus or commission to defendant for such additional credit, he executed a further mortgage for $400. On the second farm, he executed a mortgage for $4,000, to cover the previous encumbrance and the $1,700 credit. As a bonus or commission to defendant on this transaction, he executed another mortgage for $300. In this manner, $5,000 of the purchase price was paid. For the remaining $1,800 of the purchase money, the brother, Levi, was to receive a mortgage subject to the foregoing; but the formal execution and acknowledgment of this mortgage had been neglected, up to the time of the transaction herein assailed. The plaintiff's first farm was sold by him for $5,200. He had a margin therein, over and above the encumbrance, of $1,300. This margin of credit was assigned by him to the defendant as additional security. It was used, in part, by the defendant in the payment of accrued interest and taxes due up to February 1, 1913. The mortgages for $4,000 and $2,700, respectively, were negotiated to third parties by the firm of the defendant shortly after their execution; but such firm, nevertheless, looked after the collection of the interest thereon and the protection of the security thereof on behalf of the transferees. The assignment of the $1,300 item was obtained by the defendant less than a month prior to the deed involved herein.

The evidence of duress and fraudulent representations is in some respects indefinite and unsatisfactory, as will hereinafter appear. On the other hand, very important and significant facts are practically undisputed, and these are of such a nature as to give rise to strong inference against the defendant. It is evident from this record that the plaintiff was an ignorant man, and that he had placed great reliance upon the defendant for several years in the transaction of his business. He counselled with him often, and the defendant assumed to

give him counsel. The fact that the defendant could obtain from the plaintiff a mortgage for $400 as a commission for obtaining an additional credit of $1,000, and that this could be done apparently without negotiation or question, is a suggestive circumstance, indicating the very modest business capacity of the plaintiff and a somewhat different business capacity on the part of the defendant. All of the circumstances of the case point in the same direction. When the plaintiff bought the land from his brother Levi, he had nothing to pay, except what the defendant loaned him. The defendant appears to have drawn the papers of conveyance and security between the two brothers. He drew the mortgage from the plaintiff to Levi for $1,800. This mortgage was not acknowledged, and it was later returned to the plaintiff to be acknowledged by himself and wife. It was in their hands at the time the defendant obtained the deed involved in this case. It is undisputed that, at that time, the defendant advised the plaintiff to burn the mortgage, and that the plaintiff thereupon did burn the same. The defendant's explanation of this circumstance is that the plaintiff told him that Levi did not want the mortgage and had given it back to him. The only effect of the surrender or the destruction of such mortgage would be to reduce the encumbrance to that extent upon the property which the defendant was acquiring. Its destruction operated to the benefit of no one save the defendant. As between the defendant and the intervener, Levi Wright, such conduct on the part of the defendant has become immaterial, because, upon the trial, he conceded the right of Levi to his lien. However, it throws a very unfavorable light upon the motives and the conduct of the defendant in the original transaction as between him and the plaintiff. As between him and the intervener, Levi, the defendant, in his original pleadings, denied the right of Levi to his lien, and such was the state of the pleadings up to the time of the concession made upon the trial. All the circumstances appearing in the record tend to show that the defendant had a great

influence, if not a subtle power, over the plaintiff. The plaintiff was not only manifestly ignorant and timid, but he was sick and in the care of a physician. He was greatly worried over his financial affairs and over threatened suits, and was greatly concerned as to what might happen to him in case of bankruptcy proceedings. The defendant was at the home of the plaintiff when the deed was obtained. He claims to have gone there at the request of the plaintiff. The only reason for such request apparent in the record was the plaintiff's desire to counsel with him. As to the circumstances preceding the execution of the deed, the plaintiff testified as follows:

"He said, 'They will jump on to that forty acres and sell it, and that will get you into very serious trouble.' I wanted to know what kind of trouble. He said it was a penitentiary offense for me to do so. I said, 'I can't see how it is.' He said that it was, and I would go if I did not deed the land to him. I says, 'There is nothing for me to do only to do that to save myself.' He said that would save me then. I said, 'I thought the mortgage would save me.' He said, 'No, you have a mortgage on it and it would save only that one forty; it would make it cost them $100 an acre and he couldn't put that much in it.' He says, 'Joe, do you know what kind of a fix you are in?' I says, 'I know I am awfully bad in debt, Henry.' He says, 'You are worse than that.' He says, 'You are liable for the penitentiary.' I deeded the land to him because he said he would send me to the penitentiary if I did not; that, if I did not deed it to him and clear myself without letting other people jump on to it, he would send me to the penitentiary. It scared me and made me so nervous I could not sleep. I had been ill for a couple of years, doctoring with Doctors Robertson and Tamisea of Missouri Valley for nerve and heart trouble, and did not sleep for about a week after he told me that. I would not have deeded the land to him if he had not threatened to send me to the penitentiary. I told my wife before she signed the deed what Mr. Rohling had told me and the threats he had

made. She said the only thing to do was to give him a deed and let him go. That was on the day the deed was signed. Mr. Kynett, who works in Mr. Rohling's office, came from Council Bluffs in an automobile and took the acknowledgment of the deed, and Mr. Rohling went back to Council Bluffs with him. . . . I placed dependence on Mr. Rohling. He always said he would do it (figuring), and save me hiring lawyers and save me costs, because I needed money and he wanted to help me out. He told me that there was no use to see a lawyer—it would only cost more money. I wanted to see a lawyer to have the deeds made out correct, and Rohling said there was no time to fool away and it would make expense and they could do it just as well.''

The wife of the plaintiff was very deaf, and could not hear an ordinary conversation. She did not hear the conversation between the plaintiff and the defendant, but each of them testified that her husband explained to her what the conversation was, their testimony differing, however, as to what was actually said. Mrs. Wright testified as follows:

''I remember Mr. Rohling being at our home about a year ago. My husband told me that Rohling said he would send him to the penitentiary if he did not sign the deed, and I believed he would. Both myself and my husband were frightened at the time we signed the deed. . . . That was our home, and the only home we had. My husband told me that Rohling said to him that we must make the deed or he would have my husband put in the penitentiary; that something my husband had done about the land was wrong and that he could be put in the penitentiary for it. He told me those things after Rohling had talked with him, and he told them to me in the hearing and presence of Rohling the day the deed was made. I believed what he said was true and that he would put my husband in prison, and that is why I signed the deed. I would not have signed it if I did not. It is our only home; we sold our other home to buy this. I never received anything for the place or for the deed.''

The defendant Rohling testified as follows:

"At the time the deed was made by Joe Wright to me, he told me that some people were about to start suit against him, and that he owed a number of people and that he wanted to protect us, and asked me if he could not turn the farm over to me to protect me before his creditors jumped onto him, and I told him that, if that was the way he felt about it, he could do so. He said that, if he could have the farm for two years, he could make some money off of it and perhaps get on his feet. I called Kynett from Council Bluffs to come to Wright's place. He asked me about bankruptcy proceeding, and asked me whether, if he sold anything, he could be sent to the penitentiary; and I said, 'Joe, I think if you go up to the U. S. Court and swear falsely you surely would be sent off.' I never told him that if he failed to make any of the payments that he could be sent to the penitentiary at that time, or at his house. When we got to the house Mrs. Wright was there, and in about a half or three-quarters of an hour, Kynett came. Joe told Mrs. Wright of the arrange-ment. He did so by talking to her. She did not say any-thing, but seemed to be satisfied. He said, 'What do you think of that?' and she said, 'I don't think, what do you think of it?' and he said, 'It is all right, because it will let us out in good shape,' and he said, 'I figure that with two years' crops I will be ahead, not having any interest or taxes to pay.' The deed was prepared, and Joe told her it was a deed to the farm. She made no objection to signing it. While I was there, there was not anything said by Joe to Mrs. Wright that if they permitted any default in the interest on any of these mortgages he might go to the penitentiary, or any talk about sending Joe to the penitentiary if he let the interest default. I never at any time or place suggested to Joe Wright that if he should let the interest or tax payments remain unpaid I would send him to the penitentiary, or that anybody else could send him. There was nothing said about the penitentiary except what I have said before in reference

to the bankruptcy proceeding. . . . I have known Joe Wright about fifteen years. At the time I talked to Wright at Honey Creek, he seemed angry rather than excited. A man had threatened to start suit against him. He said he would protect the mortgage by deeding the land to me by saving the cost of foreclosure. I did not agree to save this cost for him at the time he gave the deed, nor to pay the $4,000 mortgage, nor to pay the $1,800 mortgage to Levi or to cancel the $300 commission note. I did not own the $4,000 mortgage at that time, nor the $1,800 mortgage that Levi Wright had.

"I did not agree to pay the interest on the $4,000, and simply took it subject to interest for two years. He did not seem to be alarmed or scared at the time he was talking to me, and did not express himself about being afraid of going to the pen. I heard Mr. Wright tell Mrs. Wright he was going to make the deed to me, and she said that she thought it would be a lot better than to move. I did not agree to pay the interest. I agreed not to bother him about it; in plain words, not to dun him. I was looking after the $4,000 for the holder of it. I did not extend the time on it. I could not prevent Levi Wright from foreclosing his mortgage and did not agree to. Q. What was Joe Wright getting out of this at all, just tell the court? A. Joe Wright figured that he was getting, with good luck, $1,200 a year for two years without any taxes, or interest. In other words, he figured at the end of two years, with ordinary good luck, he ought to have $2,400 or $2,500 in cash. . . . As near as I can remember it, in Joe's own language, when I got off of the train at Honey Creek Joe was there and shook hands with me, and he said, 'Do you know, Henry, some of these fellows I believe are going to raise the devil with me. This man Diller Beck is about to start suit;' and detailed other men whom he owed and whom he was afraid might go after him if they understood that this man Diller Beck had started suit in Harrison County. 'Now,' he said, 'You boys have always

treated me square down there and you have sent the interest for me when I did not have the money, and the taxes;' and he said, 'You advised me against this piece of land in the first place, and I am sorry I did it; I am into it now, and I want to save my hide and get out the best I can.' I asked him how much he owed and who he owed it to, and he detailed these different people to me; and I said, 'How much more do you owe beside the loan?' and he said, 'I don't know, I have never figured it up, but it is quite an item;' and he said, 'I want to protect you;' and, 'Can't I turn this thing over to you? Can't I turn the land over to you and protect you in that way before these fellows jump onto me?' And he said, 'Han't there some way that I can have the use of it for a year or two so I can get on my feet?' I said, 'Joe, if that is the way you feel about it, I expect we can.' He said, 'What can we do?' I said, 'The only thing you can do is for you to give me a deed of this farm and I will give you a lease for two years and give you two years' crops.' Just prior to that, I asked him about how much a man could make off of the place in a year. He said, 'With fair farming, I ought to be able to get out $1,200 if the year is good, maybe.' He said, 'At the end of two years, I could square up with some of these fellows; at the end of the second year, maybe I can buy me a little house and have it clear.' He asked me if we could make the deed and lease that day. I said I didn't know; that the only way I could do it was to have a man come up there in a machine with some blanks. I stepped down to the telephone in the grocery store at Honey Creek and called up Kynett.''

1. The weak thing about the plaintiff's evidence is the senselessness of the threat to which he succumbed. There is much reason for saying that it was too senseless to affect a man of ordinary intelligence. On the other hand, it was no more senseless than was the act of the plaintiff in making the conveyance. There is no reason made apparent in the record for the conveyance, except the bewilderment of the plaintiff from some cause. He had an undisputed margin of value of

$3,000. Although he was insolvent, this margin of value was all protected by his homestead exemption. The purported consideration for the deed was a mere form without substance. It was merely carved out of the gift. The transaction simply amounted to a deed of gift, with a reservation of two years' possession. According to the defendant's own testimony, he assumed no encumbrance and no obligation, except to refrain from "dunning" the plaintiff. There was no delinquency of principal or interest. While the defendant denies the testimony of the plaintiff as to the threats, his own testimony only discloses a different form of artifice for obtaining the deed. According to his version, the plaintiff was asking counsel, as he had done many times before. His testimony discloses that, in the course of this counsel, the subject of the penitentiary was considered: "Joe, I think if you go up to the United States Court and swear falsely, you surely would be sent off." Such is the defendant's version of what he said about the penitentiary. It has in it corroboration of the plaintiff's story. There was no occasion presented for a candid discussion of the penitentiary.

Rohling's evidence would furnish a basis for a claim that the plaintiff's only motive was to get the property out of his hands before it could be seized by creditors. The undisputed evidence as a whole, however, does not warrant any such claim, and no such claim is made for it by counsel, either in the pleadings or in the argument. The encumbrance on this land would fully exhaust all that part thereof not included within the homestead. Bankruptcy proceedings could not interfere with the plaintiff's right to his homestead. Indeed, it appears from the evidence that bankruptcy proceedings were instituted shortly after the commencement of this suit, and that the trustee in bankruptcy, having investigated the facts, made no claim to any interest in the property involved.

The sum of the whole situation is that the defendant obtained by the deed in question, without any substance of consideration whatever, all the property of this plaintiff. The

only uncertainty in the case is the details of the method by which the conveyance was induced. The act of conveyance was unnatural, and disastrous to the plaintiff and to his family. There was, necessarily, some reason for it. The record discloses no adequate reason for it except that testified to by the plaintiff and his wife. While the threats testified to were preposterous, and for that reason ought to be scrutinized, and might even be rejected on that score if the conveyance had the support of any substantial consideration, yet they fit into this record with marked consistency, and serve to illustrate the great inequality of intellectual capacity between the grantee and the grantor in this transaction. On the other hand, the version of the defendant, Rohling, only makes of himself a counselor and friend, who was besought for advice, and who went to the plaintiff's home, at the plaintiff's request, for that purpose. If he thus assumed to act as counselor, then counselor he was. As a result of his counsel, he obtained all of the plaintiff's property and gave nothing. As bearing somewhat upon the case, see *Wahl v. Taylor,* 176 Iowa 353.

2. Mrs. Wright, the wife of plaintiff, intervened as plaintiff for the purpose of protecting her homestead right. Her right to intervene was denied by the trial court upon the ground that the petition was not filed in time. Later, when the decree was entered in favor of the defendant, the rights of Mrs. Wright appear to have been adjudicated on their merits. The point is made on appeal, in her behalf, that, having abated her action, so to speak, by refusing her the right of intervening, the court had no jurisdiction to adjudicate her claim on the merits. The point would appear to be well taken, but is without materiality in view of our conclusion upon the appeal of the plaintiff.

3. While the case was pending, and before it came to trial, the plaintiff signed and delivered to the defendant a paper purporting to disclaim any interest in the suit. The execution of this paper was first disclosed by the evidence. It was not filed by the defendant except after the presenta-

tion in evidence. The plaintiff claimed, in the evidence, to have repudiated the paper. He was, in fact, in court prosecuting his case in the actual trial thereon, when the alleged disclaimer was first brought to the attention of the court. The trial court wholly ignored such alleged disclaimer in the decree entered herein. There was some evidence as to the reasons for the signing of such paper, and as to the promises made by the defendant as an inducement thereto. In view, however, of the state of the pleadings and the apparent abandonment thereof by the parties, and the ignoring thereof by the court in the final decree, we think there is no occasion for our consideration of it, further than as an item of evidence bearing upon the issues made by the pleadings. Indeed, this is all that the appellee claims for it. We do not find enough weight in the circumstances as evidence to justify any different conclusion than we have announced in the first division hereof.

It is our conclusion that relief must be had against the deed in question, and that the same must be set aside. The decree entered below, must, accordingly, be—*Reversed.*

LADD, GAYNOR and SALINGER, JJ., concur.