M. C. ENNOR, Executor, et al., Appellants, v. HENRY P. HINSCH et al., Appellees.

No. 42562.

APRIL 2, 1935.

Fisher & Riter, for appellants.

Diamond and Jory, for appellees.

MITCHELL, J.—Peter Hinsch lived in Lyons county, Iowa, for more than forty years prior to his death. He was the owner of 120 acres of farm land in the vicinity of George and of a residence property in the town, these being the two pieces of real estate involved in this action. In February of 1930 Peter Hinsch deeded the farm in question to his son, Henry Hinsch, and the town property to his daughter-in-law, Margaretha Hinsch. Eleven months later he died. He had prior to that time, and on, to wit, the 15th of January, 1929, made a will, which was duly admitted to probate, and M. C. Ennor, the executor named therein, who was a banker in George, Iowa, was duly appointed. The executor commenced an

action to set aside the deeds, and later Anna Marie Sohl, the daughter of Peter Hinsch, joined in the petition of the executor.

Evidence was submitted, and the lower court held in favor of the defendants and dismissed the petition of the plaintiffs. These parties, being dissatisfied with the judgment and decree of the lower court, have appealed to this court.

Peter Hinsch died testate on the 24th day of January, 1931, at the age of seventy-four. He had some years before acquired two tracts of real estate, one of eighty acres and one of forty acres. He and his wife and family—consisting of his son, Henry, one of the defendants and appellees in the case at bar, and a daughter, Anna Marie—lived upon this farm, the father and son working the land, and, as far as the record shows, it was a happy family and a prosperous one, for the farm was clear and there was money in the bank. In 1916 the son, Henry, married. He was at that time twenty-eight years of age. After the son's marriage he and his wife lived upon the farm, and his father and mother moved into a small residence owned by Peter Hinsch in the town of George. There they resided up until the time of the death of Mrs. Hinsch, which occurred on March 20, 1928. After the death of his wife, Peter Hinsch moved back to the farm and lived with his son and daughter-in-law upon the 120 acres, one of the pieces of property over which this lawsuit was brought.

Peter Hinsch's daughter, Anna Marie, who is one of the appellants in this case, was married when she was quite young, and immediately upon being married she moved with her husband to Illinois and then to Davenport, Iowa, where she had resided at the time of the trial for a period of some twenty-seven years. She made frequent visits back home, and her parents visited her in Davenport. After her mother's death she made only one trip back, and at that time visited with her father at the home of her brother, Henry. No one can read this record and come to any other conclusion than that there was an exceedingly close relationship between the daughter and her father and mother at all times; that, while she had left home when still a very young girl, she had been in contact with her parents all of the time and had been a loving and dutiful daughter, anxious to do her part in making the closing years of their lives happy ones.

At various times Peter Hinsch made wills—four in number, three of them being drawn by Mr. Ennor. In all of these wills he

left the farm to his son, with a provision that money should be paid by the son to the daughter. The amount to be paid varied in each of said wills. In the last will, which was the one admitted to probate, and which was dated January 15, 1929, Peter Hinsch left the farm to his son and directed that his son pay to the daughter, Anna Marie, the sum of $6,000. The deeds which the appellants are seeking to set aside were made, executed, and delivered on the 25th day of February, 1930, which was just thirteen months after the making of the last will and testament of Peter Hinsch.

It is the contention of the appellants that the conveyances complained of were made under duress and undue influence and were contrary to the intention of the decedent; that they were brought about by threats which the appellees made to Peter Hinsch when he was living with them on the farm; and that there was no valuable consideration for the transfers in question. It is also the claim of the appellants that the burden of proof, due to the confidential and fiduciary relationship which existed in this case between father and son, rests upon the grantees to overcome the presumption against them arising from such confidential and fiduciary relationship, and that the appellees must show, by a preponderance of the evidence, that the conveyances were not procured by undue influence and that said deeds were in fact the free and voluntary act of the decedent.

The first question is, Where does the burden of proof rest? Was there such a confidential relationship between the father and son in the case at bar so as to place the burden of proof upon the son to show the bona fides of the transaction? In the case of Osborn v. Fry, reported in 202 Iowa 129, 209 N. W. 303, this court said at page 130:

"The mere kinship existing between the parties, that of first cousins, is not sufficient, in and of itself, to place the burden of proof upon the grantee in an action of this character. It is the well recognized rule in this state that the relationship between a grantor and grantee may be so intimate, confidential, and fiduciary that the burden of proof may properly be placed upon the grantee, to show the bona fides of a transaction of this character. The rule is, of necessity, applied according to the peculiar circumstances of the particular case where the question arises. It is difficult to lay down a hard and fast rule in such cases, except the general rule that the circumstances of any particular case may show such confidential, fiduciary, and trust relation as that the burden to establish the bona

fides of a conveyance that is attacked should rest upon the grantee. As illustrating our holding under a variety of circumstances, see Good v. Zook, 116 Iowa 582, 88 N. W. 376; Eighmy v. Brock, 126 Iowa 535, 102 N. W. 444; Jordan v. Cathcart, 126 Iowa 600, 102 N. W. 510; Reese v. Shutte, 133 Iowa 681, 108 N. W. 525; Curtis v. Armagast, 158 Iowa 507, 138 N. W. 87; Johnson v. Tyler, 175 Iowa 723, 157 N. W. 184; Wahl v. Taylor, 176 Iowa 353, 157 N. W. 867; Wright v. Rohling, 177 Iowa 368, 158 N. W. 487; Flynn v. Moore, 181 Iowa 1163, 165 N. W. 351; Jacobson v. Byrd, 185 Iowa 1107, 171 N. W. 595; Pruitt v. Gause, 193 Iowa 1354, 188 N. W. 798; Johnson v. Johnson, 196 Iowa 343, 191 N. W. 353."

Justice Weaver, in the case of Curtis v. Armagast, 158 Iowa 507, 138 N. W. 873, in a very able opinion, presented and assembles practically all of the cases bearing upon the proposition with which we are confronted in this case. In that opinion he says:

"While the relation of parent and child is nearly always given as an illustration of confidential relations, it does not follow that all transactions between persons occupying that relation are presumptively invalid. Indeed, it may be said that as a general rule the conferring of benefits by a parent upon a child is presumptively valid. The unfavorable presumption arises only where the child, by reason of its youth and inexperience or other special circumstances, is to some degree under the dominion, control or paramount influence of the parent, or where the child is the dominant personage in that relationship and the parent has become the dependent one, trusting herself and her interests to his advice and guidance. Mulock v. Mulock, 31 N. J. Eq. 594; Parker v. Parker (N. J.) 5 A. 586; White v. Daly (N. J. Ch.) 58 A. 929; Fitch v. Reiser, 79 Iowa 34, 44 N. W. 214; Nobles v. Hutton, 7 Cal. App. 14, 93 P. 289; Gibson v. Hammang, 63 Neb. 349, 88 N. W. 500; Doyle v. Welch, 100 Wis. 24, 75 N. W. 400; Cole v. Getzinger, 96 Wis. 559, 71 N. W. 75; Mott v. Mott, 49 N. J. Eq. 192, 22 A. 997.

"This is in no manner inconsistent with the undoubted right of parents to dispose of their estate as they may think best. They may by deed or will dispose of it to persons outside of the family, or may give it all to one or more of their children and ignore the equal and perhaps superior rights of others. No presumption of fraud or undue influence arises from the mere fact that a mother exercises such right, or that she has preferred one child and left

another unprovided for; but when, in addition to such a conveyance, under such circumstances it appears that she was at the time wholly dependent upon the grantee for advice, residing in his home and placing in his hands the management and control of all her business interests, and in all things manifesting her implicit confidence and trust in him, the taking of a conveyance of substantially all her estate without consideration and without any writing binding him to support her through life, there is a presumption of undue influence which equity will require the beneficiary of the transaction to rebut before his claim of title thus secured can be sustained against an attack by the grantor or by these who succeed to her rights. The rule is well stated in Mott v. Mott, 49 N. J. Eq. 192, 22 A. 997, as follows:

" 'With reference to transactions between parent and child, the law presumes that the influence of the parent over the child during the tender years of infancy is so controlling that it regards transfers from child to the parent on arriving at majority or immediately thereafter as having been made under the influence of overweening confidence. As the child matures and acquires experience and independence, the presumption weakens and at last ceases. As the parent, however, advances in years, the condition of dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks to a son or daughter for advice and protection. The parent becomes the child with the same dependence, overweening confidence, and implicit acquiescence which had made the other in infancy the willing instrument of the other's desires. Highberger v. Stiffler, 21 Md. 338, 83 Am. Dec. 593; Martin v. Martin, 1 Heisk. 653; Comstock v. Comstock, 57 Barb. (N. Y.) 453; Whelan v. Whelan, 3 Cow. (N. Y.) 557. If, under such circumstances, a son obtains a conveyance from a parent, the court will not permit it to stand unless he establishes by abundant proof that the contract was free and fair and made with the utmost good faith.'

"In Fitch v. Reiser, 79 Iowa 34, this court had to consider a conveyance by an old man to his daughter, upon whom he largely depended for advice and in whom he placed great reliance. After considering the evidence, we said:

" 'We are not prepared to say that the evidence shows an absolute want of mental capacity to make a testamentary disposition of property. But in consideration of the extreme mental weakness of

the deceased at the time the deed was executed, and as the property in controversy embraced substantially all of his estate, and as the deed was without consideration, and in view of the relation of trust and confidence between the parties to the conveyance, we think the learned district judge was right in entering a decree annulling the deed. The control of the defendant over the deceased appears to have been absolute. Under such circumstances, it was incumbent upon the defendant to show that the conveyance was made voluntarily and without the exercise of any influence on her part to procure the same.'

"In Reese v. Shutte, 133 Iowa 682, 108 N. W. 526, the court, speaking by Sherwin, J., said:

" 'It is well settled that transactions of this kind between an aged and infirm parent who has reposed confidence and trust in the child will be closely scanned by the court, and that the burden is on the grantee to show the bona fides thereof.'

"The same rule is approved in Spargur v. Hall, 62 Iowa 500, 17 N. W. 743. In Davis v. Dean, 66 Wis. 109, 26 N. W. 740, where a deed from mother to son was in question, the court, after discussing the evidence of mental competency, uses this language:

" 'The transaction, if upheld, practically disinherits her daughter and her other heirs. Assuming her mental competency, this strange and unnatural disposition of her property of itself strongly suggests the existence of improper influence upon her mind.'

"Of the burden of proof the court further says:

" 'The grantee has failed to satisfy the requirements of the rule, and the presumption of injustice, fraud, and wrong stand against the conveyances, which he must remove before the court is authorized to say that they are valid.'

"The same rule is applied in Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430. Dealing with a conveyance from an aged mother to a son to whose hands she had intrusted all her business and upon whom she largely relied in all her affairs, the Illinois court has said:

" 'A gift made by a parent to a child on account of the affection of the former for the latter, even where it is made at the solicitation of the child, is not the object of suspicion, and there is no presumption against its validity unless the relation between them is something more than the ordinary relation between parent and child. Where, however, the natural positions of the parties become reversed—where the parent defers to, trusts in, and yields to the

child, when there exists between them what in law is termed a fiduciary relation in which the parent is dominated by the child, and where the child prepares or causes to be prepared and executed an instrument conveying to him property of the parent as a gift or upon a grossly inadequate consideration—the presumption arises that the transfer was obtained through undue influence, and the burden rests upon him to show that the conveyance was the result of full and free deliberation on the part of the parent. This is not peculiar to transactions where the parties are parent and child, but is the law in any case where a fiduciary relationship exists, where the conveyance is from the dependent to the dominant party, and where the donee or grantee prepares or procures the preparation and execution of the deed or other instrument; and the rule is applied under such circumstances wherever that relation exists, no matter whether the parties are related by blood or not.' (Rickman v. Meier, 213 Ill. 507, 72 N. E. 1121.)'

"The rule of the cited cases has been very frequently affirmed and prevails in practically all the states. For example, in addition to the cases hereinbefore cited, see Coffey v. Sullivan, 63 N. J. Eq. 296, 49 A. 520; Hensan v. Cooksey, 237 Ill. 620, 86 N. E. 1107, 127 Am. St. Rep. 345; Soberanes v. Soberanes, 97 Cal. 145, 31 P. 910; Brummond v. Krause, 8 N. D. 573, 80 N. W. 686; Kerr on Fraud & Mistake, 150–152; Thorn v. Thorn, 51 Mich. 167, 16 N. W. 324; Parker v. Parker (N. J.) 5 A. 586; Bowe v. Bowe, 42 Mich. 195, 3 N. W. 843; Slack v. Rees, 66 N. J. Eq. 447, 59 A. 466, 69 L. R. A. 393; Hall v. Otterson, 52 N. J. Eq. 528, 28 A. 907; White v. Daly (N. J. Ch.) 58 A. 929; Post v. Hagan, 71 N. J. Eq. 234, 65 A. 1026, 124 Am. St. Rep. 997; Hattie v. Potter, 54 Wash. 170, 102 P. 1023; Swanstrom v. Day, 46 Misc. Rep. 311, 93 N. Y. Supp. 192; Couch v. Couch, 148 Ala. 332, 42 So. 624; Highberger v. Stiffler, 21 Md. 338, 83 Am. Dec. 593." Pages 522–526 of 158 Iowa.

In view of the cases just cited, let us examine the record in this case to ascertain whether the burden in the case at bar is upon the appellees affirmatively to show that the deeds under which they claim were obtained without undue influence and were the free, voluntary, intelligent, and unrestrained act of the grantor. Peter Hinsch moved out on the farm to live with his son and daughter-in-law immediately after the death of his wife in 1928. He was at that time a man advanced in years. During the next two years we find that he left the farm very seldom. Once in a while, unknown

to Henry and his wife, he would slip over to the neighbors to visit with them. The management of the farm was entirely in Henry's hands. Improvements were put upon the farm. There is no question that the money of the father was used, although the son claims to have contributed. But Henry was the one who said what should be done and how it should be done. Henry signed checks on his father's bank account. Whenever Peter Hinsch went to town, which was seldom, Henry went along. During this period of time his father complained to the neighbors, and to his brother, in regard to the way Henry was treating him. When one of the wills prior to the last will was made, Henry went with his father to the bank. An argument took place in the bank between Henry and his father in regard to the amount of money which his father should leave to his daughter. Henry said many uncomplimentary things about his sister. The father wanted to leave the daughter $6,000 or $8,000 in his will, and Henry objected strenuously. Finally the amount was cut down to $1,000. During the period of time between 1928 and when the deeds were drawn Henry dominated his father, had absolute control over him and ran the father's business. When the last will was made Henry was not present. It must be kept in mind that this was made just thirteen months before the deeds were made. The will was drawn by the banker in George, and in that will the father left to his son Henry the farm, but directed that his son should pay to the daughter, Anna Marie, the sum of $6,000. Thirteen months later we find Henry and his wife taking the father to George to the banker, where Henry informed the banker that his father wanted to deed the farm and the town property, the farm to Henry and the town property to Henry's wife. The banker informed him that he would not draw the deeds and so Henry immediately took his father on to a nearby town, to a stranger, and this stranger prepared the deeds. It is interesting to note that the evidence of the scrivener shows Henry made all the arrangements and did all of the talking. The scrivener testified as follows:

"Q. Of course you knew Peter Hinsch and Henry Hinsch and his wife? A. Not until they came to the office.

"Q. You did know them when they got there? A. When they introduced themselves.

"Q. You didn't know them before? A. No.

"Q. Tell in your own way what happened. A. The three people came into the office and asked me if—that is, Henry and his wife

asked me if I would prepare some deeds, and I said, yes, I would. I talked to them what they wanted and they told me, and I prepared these two instruments, and asked Mr. Hinsch when I made up my notes if that was what he wanted.

"Q. Isn't it also a fact that Peter Hinsch said very little? A. That is true."

And so we find that the arrangements for the making of these deeds and the conference at the time the deeds were made, were brought about by Henry. We find the testimony of the banker, who refused to prepare the deeds that Henry wanted prepared, in which he testified that in a conversation with Peter Hinsch some time shortly before the deeds were made, Peter Hinsch told him, referring to Henry and his wife, "They can kill me before I do it; I never will deed that property as long as I live." We find the testimony of Peter Hinsch's brother, in which he testified that Peter told him Henry and his wife were after his money. We find the testimony of the disinterested neighbors to the same effect. We find that, after making these transfers, Peter Hinsch had nothing left except a little over $900. He had transferred all of his property to his son, without any agreement to see that he was properly taken care of. It means that he divested himself of all protection. He placed himself entirely at the mercy of his son and his daughter-in-law for his support. Suppose he had outlived them. It would have meant that he had no means of supporting himself other than that bounty which they might have left to him. There was no consideration for the giving of the deeds. Clearly, under this record there was a confidential or fiduciary relationship between the father and son. Henry had absolute control of his father, and, exercising this control, he directed and had prepared the deeds transferring the property. The father had no opportunity of consulting with any disinterested party. He was led by Henry, first to the banker at George, where the banker refused to draw the deeds, and then to the abstracter in a nearby town, where Henry informed the abstracter what he wanted done.

But, it is the claim of the appellees that the grantor was of sound mind. With this we agree. There is no showing in this record that Peter Hinsch was not mentally sound. He was advanced in years, but his mental faculties were good. Turning again to the case of Curtis v. Armagast, we find this court said, 158 Iowa at page 531:

"They do offer evidence of witnesses to the execution of the deed that the grantor appeared to be of sound mind and to have an intelligent conception of what she was doing, but this falls far short of negativing the presumption or inference of undue influence. In a large majority of the cases hereinbefore cited the mental capacity of the grantor to make a valid conveyance is conceded, but it is universally held that this showing does not of itself fill the requirements of the rule."

So, conceding the mental soundness of Peter Hinsch, this does not fill the requirements of the rule.

But the appellees claim that it was the desire of Peter Hinsch to leave to his son the land, and that he had often made that statement to neighbors. There is evidence in the record that he had made statements that he desired to leave the farm to his son. Not only were there statements to that effect, but the will which was admitted to probate did leave to the son the farm. But it charged against the farm and directed the son to pay to the daughter the sum of $6,000. The appellees argue that the son stayed at home until he was twenty-eight years of age. That he worked on the farm. That after he was married in 1916, up until the time the farm was deeded to him, he always paid rent to his father for the farm. There is no question that the son did stay at home; that he worked on the farm up until the time he was married. Neither is there any evidence in the record that during this time there had been any trouble of any kind between the son and the other members of the family. There is some dispute in regard to what rent the son paid to the father after the father moved to town. But the record shows he did pay rent. However, the father made improvements upon the farm. At the time he moved to the farm, in 1928, he had better than $4,000 deposited in the bank at George, Iowa. If the son paid the rent which he claimed he did, this would be added to the amount which the father had, and yet, between 1928 and the time of his death, all of the money which had been on deposit in the bank, had been expended, with the exception of a little over $900. This would also include whatever rent money the son paid. What happened to this money does not clearly appear in the record. A great deal of it was used by the father in improving the farm. Certainly the father did not spend any money during the time he was on the farm after his wife died. The height of his extravagance seems to have been a new pair of overalls and a little chewing tobacco. But

the appellees argue that the father, at the time the deeds were made, agreed to the deeds. It must be kept in mind that the father had no independent advisor. This very question is answered in one of our late opinions, in the case of Johnson v. Johnson reported in 196 Iowa 343, 191 N. W. 353, and it is interesting to note that Justice Evans, who dissented in the case of Curtis v. Armagast, was the writer of the Johnson opinion. The court says (pages 348, 349) :

"It is a rare case where the dominant individual in a fiduciary relation can sustain a gift to himself by the one who is dependent upon him. Whereas the defendant had assisted her husband in his few matters of business before his illness, she had now, by his illness, become his sole dependence. If some one else had sought to obtain a conveyance of his property, she would have been his independent adviser, and would have protected him against ill-advised action. Inasmuch as she became the beneficiary of this transaction, he was necessarily deprived of her help and advice. In such a case, equity inquires, Who was his helper? Did he have any? Did he have independent advice, legal or otherwise? If his wish had been to refuse the gift, was there anyone to stand for him and to put forward the refusal? It is incumbent upon the defendant to make some answer to these questions. The burden is not met by showing simply that, at the time of the execution, he said that it was all right, or that he was glad of it. The same influence which induced the execution would likewise induce just such remarks."

Thus, we find that in the case at bar there was a confidential, fiduciary relationship between the father and the son. Henry Hinsch dominated his father during the last few years of his life. This, it seems to us, is shown by the fact that when the father was alone with the banker and made the last will, Henry and his wife not being present, he left to the son the farm and directed that the son pay to the daughter $6,000. Within thirteen months thereafter we find Henry Hinsch and his wife taking the father in to have deeds prepared which would practically disinherit the daughter. What was there to change the father's mind in that period of thirteen months? Certainly nothing that the daughter did. She had kept in contact with her father. She had visited her father. There is shown here a close relationship that existed between the father and the daughter, and yet, if these deeds are permitted to stand, this daughter is practically disinherited. We find in the record no reason

for the father changing his mind in these thirteen months, except the fact that Henry desired the change for his benefit. It is our conclusion that the burden of proof cast upon the appellees has not been met, and that therefore the deeds cannot be sustained. There will be a decree for appellants, and the decree entered below must accordingly be reversed.—Reversed and remanded.

ANDERSON, C. J., and DONEGAN, PARSONS, RICHARDS, and KINTZINGER, JJ., concur.