JOE S. UTTERBACK et al., Appellants, v. H. M. HOLLINGSWORTH et al., Appellees.

No. 39635.

MAY 14, 1929.

*Hamilton & Updegraff*, for appellants.

*Willcockson & Willcockson* and *F. M. Beatty*, for appellees.

MORLING, J.—Plaintiffs found their suit upon alleged mental incapacity of and undue influence and fraud practiced on decedent, Henry Fritzler.

I. Decedent, Henry Fritzler, acquired the farm in controversy about the time of the Civil War, was married in 1868, the next spring moved on the land, and lived there until his death. No child was born to him. The wife appears to have largely looked after their business affairs until her death, in 1922. The wife's death was a great shock to decedent. Shortly after that event, he leased the farm to defendants, who thereupon moved upon it, and took up their home with him. Defendants, who, for convenience, will be called "Hobart" and "Alma," were married in March, 1922. Alma is the granddaughter of one of decedent's brothers. Decedent, prior to February, 1926, had arteriosclerosis, and resultantly, in February, 1926, suffered a severe attack of cardiac deficiency, for which he had the medical attendance of Dr. Maxwell for about a month. On August 2, 1926, decedent made to defendants the deed now under attack. The consideration was $125 per acre,—$15,000. Defendants gave back to decedent a purchase-money mortgage for the entire price, $15,000, due in 10 years, with interest at 5 per cent per annum. The same date,

Hobart and decedent went to the county seat and had the papers recorded. On August 9, 1926, decedent had a stroke of paralysis. On October 28, 1926, two of decedent's brothers made application for the appointment of a guardian, the application being grounded on incompetency. The application was not contested, and was granted. On September 19, 1927, petition in this suit was filed. On December 10, 1927, decedent died.

Plaintiffs take their main position on the proposition that defendants sustained to decedent a confidential relationship, such as to shift to them the burden of proof. It is not claimed, of course, that the relationship was fiduciary, as matter of law, but that it existed in fact, within the doctrine of *Curtis v. Armagast,* 158 Iowa 507; *Pruitt v. Gause,* 193 Iowa 1354; 2 Pomeroy's Equity Jurisprudence (4th Ed.), Section 956. This doctrine, for the purpose of the matter now under discussion, may be stated to be that one who in fact stands in a confidential relationship to another may not retain advantage of a transaction with the *cestui que trust* which may reasonably be the result of the confidence reposed, unless he shows that the *cestui* acted with freedom, intelligence, and full knowledge of all the facts. The purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence. It is a prerequisite to the application of the doctrine that faith and confidence be reposed; that the repository shall be thereby in a position of superiority or dominance, while the *cestui* is in a corresponding position of inferiority or subservience. Proof of active exercise of undue influence in fact, or the existence of mental weakness or incompetency on the part of the *cestui,* is not essential to the application of the doctrine. 2 Pomeroy's Equity Jurisprudence (4th Ed.), Section 955 *et seq.* Undue influence, for the purpose of the point now under consideration, is a phase of actual fraud, and its existence, or the existence of mental incapacity, is sufficient, of itself, to invalidate the transaction; but, in the case of dealings between the trustee and the *cestui que trust* in which the trustee obtains an advantage or benefit, though the *cestui* acts in his own behalf, the transaction is, in equity, presumptively the result of overreaching or of fraud, and its validity must be affirmatively established by the trustee. Before the doctrine can be applied, however, the existence of the confidential relationship or the facts giving rise to it must be proved. The relationship must be such as to enable

the one charged with having abused it to have exercised it to his advantage. It must appear expressly or by implication that trust or confidence was reposed. The supposed trustee must be shown to have been in a position of advantage or superiority such as to imply a dominating influence over the *cestui*. *Albaugh v. Shrope*, 197 Iowa 844; *Bradley v. Bradley*, 185 Iowa 1272, 1279; *Nixon v. Klise*, 160 Iowa 238, 244; *Krcmar v. Krcmar*, 202 Iowa 1166, 1171; *Shaffer v. Zubrod*, 202 Iowa 1062; *McNeer v. Beck*, 205 Iowa 196.

To avoid repetition, some of the evidence more particularly bearing on other branches of the case will be referred to in this connection.

The more prominent fact upon which plaintiffs apparently rely is that appearing from the testimony of Schott, cashier of the bank, that decedent had a number of certificates of deposit, aggregating some $14,000, and that, as they respectively matured, decedent would go into the bank and obtain renewals, and Hobart would indorse decedent's name upon the certificates, in surrendering them for renewal. The testimony, however, of Schott and of Mitchell, the president of the bank, and of Mrs. McNary, the bookkeeper, is that any directions that were given concerning the renewals or decedent's business in the bank were given by decedent. Mitchell says:

"Fritzler was always there for the purpose of renewing his certificates and Mr. Fritzler talked to me about what he wanted done in the way of renewing."

On July 29, 1926, a few days before the deed was made, decedent left in the bank $300 on certificate, to be applied on a note that decedent's church was owing the bank, but with directions given by himself that the certificate was not to be cashed until the entire amount of the church's note had been received. Decedent's assessment roll, made out in February, 1926, was signed by defendant. There is no evidence that defendants had charge of the bank account or of the certificates of deposit or of any of the other business of decedent. Decedent was an old man, doubtless with the consequent physical infirmities of age. He had been ill. With few exceptions, he seems to have been dependent on defendants to take him to town. Hobart accompanied him to the barber shop and to other places, but there is no evidence that

decedent was not transacting and directing his own business, or that defendants had charge of it, or were transacting it for him. The lease to defendants is not in evidence. One of plaintiffs' witnesses says that the arrangement for it was that the farm should be leased to defendants on shares, and that decedent was to pay around $5.00 a week for board. Defendants were married in the spring of 1922. Alma was the granddaughter of one of decedent's brothers. Hobart had no previous acquaintance with him. In November, 1922, defendants moved into decedent's home. It is not shown that defendants and decedent were previously on terms of intimacy. It is not disputed that defendants provided decedent with good home and care. In July, 1925, a daughter was born to defendants. This child won decedent's affection. On November 21, 1925, decedent made a will, by which he bequeathed to the little girl $500, and to defendants $3,000 and some furniture. By the will decedent requested that, at the expiration of the then lease, a new lease be made with Hobart for another period of five years, at the existing rental, and that the farm be not sold until the expiration of the new lease. The will nominated Hobart executor, without bond. Some of decedent's brothers and sisters had died, leaving descendants, for whom no provision in the will was made, except a leather davenport to a niece. A gift of $1,000 to the church was made, and a bequest of the residue to decedent's sister and three brothers. The will was drawn by the witness Roland, who was a notary public, and in the real estate, loan, and insurance business. Roland testifies that decedent told him that he wanted to make a will, would call him up; and that he (Roland) later went out to decedent's home and drew the will; that decedent was in the room alone, and told Roland what he wanted put in the will; that Alma was about the house. Alma witnessed the will. Decedent declared to different witnesses that defendants had been good to him, and he wanted to be good to them.

The deed under consideration was also drawn by Roland, and was witnessed by Dr. Maxwell, who was the physician of decedent and defendants, and by Mitchell, who was president of the bank. On August 2, 1926, according to Mitchell's testimony, decedent hailed Mitchell on the street. Mitchell and decedent had a chat, and decedent asked Mitchell to go to Roland's office,

which Mitchell afterwards did. Dr. Maxwell was asked by Hobart to go to the office.

Roland testified that defendants came with decedent to his office. Decedent said he wanted to make a deed and mortgage, and told Roland how he wanted them made, and to whom.

"He said at that time what the consideration was. He told me $15,000. I don't remember whether I took the description off of my atlas, or whether he had a description with him. Mr. Fritzler gave me the direction also as to drawing up the mortgage. Told me who to make it out to. Mr. Hollingsworth left the room when I started to make out the deed. * * * While I was making the instrument, Mr. Mitchell and Mr. Maxwell came into the office. Prior to the time that Mr. Maxwell and Mr. Mitchell came to the office, Mr. Fritzler said something to me about their coming. * * * He said he wanted Mr. Mitchell and Mr. Maxwell to be his witnesses of the deed. * * * I heard them talking, and Mr. Fritzler was telling Mr. Mitchell that he was making a deed to the farm to Hollingsworth—selling Hollingsworth the farm. * * * He talked like he always did, as far as I could see. He appeared to understand the matters he was talking about. Q. What is the fact as to whether he appeared to understand the business he was engaged in? A. He certainly did. Q. What is the fact as to whether he appeared to understand the amount he was getting for this property? (Objected to, as calling for conclusion.) A. Yes, sir. Q. What is the fact as to whether he appeared to understand the people to whom he was making this deed? (Same objection.) A. Yes, sir. Q. Did he talk connectedly at that time? (Same objection, leading and suggestive.) A. Oh, yes. Q. Now, would you say, at that time in your office, while Mr. Fritzler was transacting this business there, he was of sound or unsound mind? A. I would say he was of sound mind."

Mitchell testified that he found in Roland's office the decedent, the doctor, and defendants, and that the decedent "said he had sold his farm to Hobart Hollingsworth, and he wanted me to witness the deed. He told me he was getting $125 an acre,—$15,000 for 120 acres. He said he wanted Hollingsworth to have it. He said Hollingsworth had given him a good home, and he wanted him to have that farm. He said he expected to stay with

Hobart. He made a statement that the income or the interest would be less trouble, and make him nearly as much, or more,—which is true. Figure it up.''

On cross-examination, this witness testifies:

''I didn't notice anything unusual in his conduct there. I think he went ahead and told me the whole contents of the deed, the whole deal there in the office, what he was getting for it, and all about it. Dr. Maxwell was there, too. * * * Q. You say it never occurred to you to question the man's mind? A. No, sir. Q. It never had occurred to you before that? A. No, sir. Q. Never did afterwards? A. No, sir.''

The doctor testifies that, at Roland's office:

''I think we talked almost entirely about the farm and his life on the farm. He said he had been there over 50 years. He told me what he was getting for the farm, $15,000. He said he wanted the Hollingsworths to have it. I asked him if he was going to stay on the farm, or if he was going to leave, and he said he was going to stay on the farm. I don't know whether it was he or I mentioned that he would be better with the interest than he would with the farm. I told him he was unable to look after the farm. He understood at the time the business he was engaged in there. * * * He seemed to think the farm was worth more than that. * * * He seemed to want Hobart to have the farm, and he wanted to stay on the farm. In all that conversation there, Mr. Fritzler talked rational. He didn't repeat his conversation, that I remember. Not so it would be noticeable. He was of sound mind. I would not have felt justified in acknowledging the deed if he hadn't been of sound mind.''

On cross-examination, the doctor testified:

''I want to be understood as saying that Henry Fritzler, in his old age, at 85 years of age, at the time he made this deed there in the office of Mr. Roland, was as sound in mentality as he had been in 1925, when I first saw him. * * * Q. You went up there with the purpose of testing his ability to make that deed, didn't you? A. It was my intention to find out. * * * I believe it is the reason they called me. * * * It was my intention, but I was called to witness his signature to the deed. * * *''

The doctor says that decedent did not have senile dementia. Defendants gave their version of the transaction, to which, because of objection to their competency, we give no consideration.

It is the claim of the plaintiffs that the advantage secured by defendants and the betrayal of their trust consisted in getting for $125 per acre land which was worth $200 to $250 per acre. They introduced a number of witnesses who valued the land at $200 to $250 per acre. The land is well located. It is now, though not at the time of the execution of the deed, on a graveled road. It is composed of three 40-acre tracts in an east and west row. The buildings are old, and of moderate extent and value, on the east end of the farm. There are a number of open ditches upon the land, some of them 18 to 20 feet wide, 5 feet deep. These divide the tillable land. The middle 40 particularly is badly cut with open ditches. The soil in places is thin, and in places seepy. The surface is spoken of as in places consisting of knolls. The testimony of witnesses for defendants values the land at $125 to $150 per acre. One of these witnesses is the cashier, Schott, who was called on another subject by plaintiffs, and who, in their argument, seems to have their confidence. His valuation is $125 per acre. It thus appears that the value is a matter of difference between people of sound judgment. Decedent was old, unable to operate the farm himself, had no wife or children, was in need of a home, was being provided with a satisfactory home, was attended by young people, one of whom was a grandniece, and who were looking after his wants. Nothing is said against defendants, either in their business as farmers or against their integrity or their conscientious endeavor to provide decedent with the home that he needed. In addition, decedent had never had the love and affection of a child of his own. One had now come into the home. When it is sought to avoid a transaction on the ground of constructive fraud such as that involved here, a material inquiry is whether the *cestui* had disinterested and competent advice, the presence or absence of which may be quite important to the determination of the case. *Pruitt v. Gause*, 193 Iowa 1354, 1359. Plaintiffs criticize defendants and the notary, Roland, because witnesses who were unnecessary to the legal execution of a deed were called. The calling of witnesses may, in particular cases, be a suspicious circumstance. The uncontradicted evidence here is that decedent himself called or asked for the calling of

the witnesses. The notary who drew the deed had previously transacted business for him, and there is no evidence that he was particularly a friend of the defendants'. One witness was decedent's own banker. There is no evidence that Roland or Mitchell had any relationship, in business or otherwise, with the defendants. Another witness was the physician of decedent, as well as of defendants. We discover no reason for thinking that any of these three men previously knew anything about or were interested in the sale to defendants. The banker and the doctor approved the transaction as a wise one for decedent. Decedent had about $14,000 in certificates of deposit, and was getting a mortgage for $15,000, drawing regular and reasonable interest, at a time when land, whatever its theoretical value, was not attractive as an investment. Decedent appears to have understood that the land might be worth more' than he was getting for it. Its realizable value was doubtful. Decedent was an old man. It is not shown that he had any other relatives who had any claims upon him. He needed a home. No attack is made upon the integrity of the defendants or upon the care which they, before the execution of the deed or since, gave to decedent. There was no dominating influence, no secrecy, no want of independent advice of the transaction. In the circumstances, the transaction was a rational one, and is not open to attack for constructive fraud.

It was said, when the deed was drawn, and concurred in by decedent's friends, that the sale was beneficial to him. This was not formal, independent advice, but it was to the same effect, and was well grounded. A man in the possession of all of his faculties might well make the same sale that was made to these defendants.

II. Undue Influence. What has been said disposes of the charge of undue influence. Before the deed can be canceled for undue influence, it must appear from satisfactory evidence that the instrument does not express the will or purpose of the maker, but rather that of another. It must appear that the act is not the free, intelligent, and voluntary act of the grantor, but that his will was overcome, and the will of another substituted. *Sutherland State Bank v. Furgason*, 192 Iowa 1295.

III. Mental Incompetency. As has been noted, defendant, at the time the deed was made, was about 86 years old. He was

suffering from arteriosclerosis, which had affected his heart. The only testimony as to the progress of the disease was that of the physician previously referred to, who says that decedent did not have senile dementia or softening of the brain. The paralytic stroke of August 9, 1926, a week after the deed was made, affected the side of the face and the tongue, and consequently the power of speech. It appears that decedent himself, after he recovered from the shock, was conscious of this fact and embarrassed by it. The doctor, however, expresses the opinion that the shock did not affect the decedent's thinking powers. This condition explains a great deal of plaintiff's evidence. Plaintiffs produced about 24 witnesses, including three of themselves, most of whom testified on the subject of decedent's mental condition. Much of this testimony manifestly relates to decedent's condition after the paralytic stroke of August 9th, which might very naturally be confused by the witnesses with the condition succeeding the heart attack, in February. In February, also, the attack was very severe, and for a time, without doubt, seriously affected decedent's faculty for recognizing his friends and acquaintances and for carrying on conversations with them. The testimony of the plaintiff's witnesses is to the effect that, particularly from 1925 on, decedent was failing mentally and physically; that his conversation was disconnected; that he did not recognize his relatives and friends.

There is testimony that defendant said that he got the farm so cheap he had to buy it; that he said he knew somebody was going to get it, and he might just as well have it as anybody else; that defendant had stated that, one time when defendants came home, they found decedent filling the oven with paper, trying to build a fire. (The happening of this occurrence is denied.) There is testimony that defendants made statements that decedent was not getting along well, and was "off;" that decedent said that he got $30,000 for the farm. One expert was called, who says, in substance, that, upon the assumption that the matters set out in the plaintiffs' evidence were true, decedent had senile dementia, and was of unsound mind. Defendants called about 31 witnesses, besides themselves, whose testimony was, in substance, that decedent, though having progressive infirmities and weaknesses of old age, and having, after the paralytic stroke

of August 9, 1926, difficulty with his speech, and requiring assistance in taking his food, and in other ways, talked connectedly and intelligently, recognized his acquaintances, showed no changes except those naturally accompanying increasing age, and exhibited no signs of mental incapacity. There is testimony that Roland said that he would not have anything to do with the deed, would not take the acknowledgment, until they brought in two witnesses. We are not informed as to the disposition of decedent's other relatives, further than that there is testimony that decedent and his brothers were friendly. But, as has been intimated, if the precautions here charged were taken, they were, in the circumstances shown here, justifiable. Old age, physical impairment, arteriosclerosis, forgetfulness, failure to recognize friends, weak-mindedness of the grantor, do not, of themselves, invalidate the deed. The evidence shows affirmatively that the decedent had sufficient comprehension of his property, its value, his relationships, and the nature and consequences of the transaction, to make the sale which he made to defendants. This conveyance cannot be set aside for mental incapacity. *Rickman v. Houck,* 192 Iowa 340; *Sutherland State Bank v. Furgason,* 192 Iowa 1295; *Nixon v. Klise,* 160 Iowa 238; *Bradley v. Bradley,* 185 Iowa 1272; *Brewster v. Brewster,* 194 Iowa 803; *Mitchell v. Mutch,* 180 Iowa 1281; *Crawford v. Raible,* 206 Iowa 732; 32 Corpus Juris 727.

IV. While it may make no difference to the parties in this case, no costs will be taxed for the abstract. More than 300 pages are so flimsily bound as to come apart during the first reading. The printing frequently requires repeated readings, and, in almost every case, repeated reference. Good printing and binding cost no more than poor. Counsel should see to it that the binding is substantial.—*Affirmed.*

ALBERT, C. J., and EVANS, STEVENS, and DE GRAFF, JJ., concur.

WAGNER, J., not participating.