A. R. MENARY, guardian of property of Frank Ray Whitney, plaintiff; LOUIS F. WHITNEY et al., executors, substituted plaintiffs, appellees, v. ADDIE M. WHITNEY, appellant.

No. 48116.

(Reported in 56 N.W.2d 70)

760

DECEMBER 16, 1952.

REHEARING DENIED APRIL 10, 1953.

John D. Randall, of Cedar Rapids, for appellant.

B. D. Silliman and Wm. W. Crissman, both of Cedar Rapids, for appellees.

MANTZ, J.—The suit was in equity and was brought by A. R. Menary, guardian of Frank R. Whitney, incompetent, to cancel and set aside a certain assignment to Addie M. Whitney of a $10,000 note and mortgage dated September 7, 1949, to Frank R. Whitney by Sidney G. Blencoe and Margaret L. Blencoe, on the grounds that Frank Whitney was then mentally incompetent and that his wife, defendant herein, was a dominant personality and thereby influenced him to make such assignment and that he was then in a poor physical and mental condition; also, that said assignment was without consideration.

The defendant specifically denied that on the date claimed Frank Whitney was mentally incompetent, denied that there was any undue influence and domination by the defendant and denied other allegations of the petition. The court found for the plaintiffs and ordered the assignment set aside and the note and mortgage declared to be the property of the plaintiffs. Defendant appeals.

The suit was begun by A. R. Menary, guardian of Frank Ray Whitney, incompetent. Upon his death in 1951, said A. R. Menary and Louis F. Whitney, executors of his estate, were substituted as plaintiffs. Hereinafter we will refer to them as plaintiffs.

I. It might be stated that the trial court in effect based its holding largely upon the grounds that at the time of the transfer of the note and mortgage involved there existed between Frank R. Whitney and Addie M. Whitney, his wife, a confidential relationship; also, that said relationship having been shown the burden was on the defendant to rebut the presumption of undue influence and overreaching on her part and to affirmatively establish the good faith of the transaction and that she took no advantage of Mr. Whitney by reason of their relationship and that he acted voluntarily, with freedom, intelligence and with full knowledge of the facts.

In its findings of fact the court seems to place considerable reliance upon the testimony of Menary's adult children; also, evidence of the illness and physical condition and the opinion of Dr. Leo B. Sedlacek of Cedar Rapids, who classifies himself as a psychiatrist, who first saw Whitney on October 7, 1949, the day Whitney was admitted to Mercy Hospital. The court also seems to have given consideration to the fact that if the $10,000 became the property of defendant it would result in a rather unequal distribution of his property as between defendant and his adult children.

II. To give proper consideration to the issues we go to the record to obtain the whole picture. Frank R. Whitney and Addie M. Whitney were married March 5, 1936. At that time they were the same age, approximately fifty-four years. Mr. Whitney had been married before. His first wife died in 1935; he had two grown children, a son, Louis F. Whitney, and a daughter, Adeline M. Kemper, both married some years before. When Frank and Addie were married the former owned an undivided one-third interest in the home he lived in, the other interests being owned by his two children. On September 14, 1925, Frank Whitney became associated with Dr. A. R. Menary, a veterinarian, in the oil and gas business known as the Home

Oil & Gas Company, at Cedar Rapids, Iowa. Whitney was manager and owned a two-thirds interest, Doctor Menary owning the other third. At its inception Whitney furnished the experience and Doctor Menary the money. After its start the oil business grew and expanded but ran into financial difficulties in the early 1930's. Along about 1935 and 1936 the financial difficulties for the most part ended. Whitney was paid from the profits in the business—Doctor Menary let his profits remain in the business. On April 22, 1947, Whitney, due to ill health, sold his interest in the business to his partner, who as a part of the same transaction sold a one-half interest therein to Sidney G. Blencoe and Margaret L. Blencoe, the former an old-time employee of the firm, for $23,000, part of which was paid by giving to Whitney a note for $10,000 and a chattel mortgage on the property purchased. The $13,000 was deposited in the bank along with a further sum of $4000 paid to Whitney out of some partnership insurance policies. The $10,000 note and chattel mortgage are the basis of this action. The $10,000 note dated April 25, 1947, drew interest at 4% and was payable on demand.

Sometime in the fall of 1942 Whitney had a heart attack and was at home, with his wife nursing him. Later in March 1943 he was taken to St. Luke's Hospital. Between the time of his heart attack and the time he was taken to St. Luke's he was not well but was up and down at times. Some years before it was discovered that Whitney had diabetes. For some years his physician tried to control this condition by regulating his diet. While Whitney was in St. Luke's he was attended by Dr. Roy Keech, who had practiced his profession at Cedar Rapids for forty years. For ten years Doctor Keech had been the medical member of the Commissioners of Insanity of Linn County. He specialized in mental diseases in addition to internal diseases. No question is made as to his qualifications. When Whitney was in St. Luke's, under the care of Doctor Keech, it was decided to try to control his diabetes by the insulin treatment administered hypodermically. This treatment was followed until Whitney passed away in February 1951. It was administered at first by Doctor Keech, who later instructed Mrs. Whitney how to give it. This was done by her under the direction

of Doctor Keech until October 1949, when Whitney was committed to the State Hospital for Insane at Independence, Iowa.

In the summer of 1943 Whitney was able to go back to his place of business, for short intervals, at first being driven there by Mrs. Whitney, and later driving the car himself. Following his return from the hospital, Whitney had various heart attacks at various intervals—sometimes several a day and then without any for weeks. At times he was quite sick from the effects of the heart attacks and the diabetic condition. In the fall of 1946 he had a heart attack while driving his car to the office of his physician. The car stopped on one of the main streets of Cedar Rapids. During all of the period from 1942 until he was taken to the State Hospital at Independence in October 1949 Doctor Keech attended him regularly; sometimes at the office and sometimes in the home. He visited him at his home the day the assignment of the note and mortgage involved herein was executed.

In order to make it more convenient for Mr. and Mrs. Whitney the bed used by them was moved downstairs in the home. In connection with the insulin treatment of Whitney a urine test was taken every morning from 1943 to September 26, 1949. This was done almost entirely by Mrs. Whitney, together with the diet foods, and result reported regularly to Doctor Keech. Due to his inability to participate in the oil business, Whitney and his partner, Doctor Menary, negotiated a sale of his interest to the makers of the note and mortgage. Sidney G. Blencoe had been a long-time employee of the firm and after discussion between the partners it was agreed that Blencoe could purchase the interest of Whitney and enter the firm. The negotiations covering this transaction covered some period of time and were carried on for the most part between Whitney and Blencoe at the office. Doctor Menary testified for plaintiff and speaking of the sale of Whitney's share stated: "In these negotiations Mrs. Addie Whitney, the wife of Frank Whitney, did not have any part, that is in the negotiations, including the sale of the business. All she did was to accompany her husband to our office at the time the negotiations were entered into."

The sale was made, various papers were prepared and signed. Whitney assigned releases and interests in various firm

insurance policies; the makers of the note and mortgage paid the consideration called for and the deal was completed. Later Whitney would go down to the office and visit. His health varied, sometimes he was better and again not so well.

On September 6, 1949, Frederick C. Fisher, Jr., a member of the law firm of Fisher & Fisher, came to the Whitney home and following some discussion prepared an assignment of the Blencoe note and mortgage. For many years the father of Frederick C. Fisher, Jr., had handled legal business for Whitney. He was the Whitneys' regular attorney. The note and mortgage were turned over to Mrs. Whitney and when suit was brought they were in her possession.

After the death of Frank Whitney, Dr. A. R. Menary and Louis F. Whitney were appointed executors of the estate. As before stated, Louis F. Whitney and Adeline M. Kemper were children of Frank Whitney by a former marriage. The record shows that both of these children were very active in this matter and employed counsel to prosecute the same. There was considerable litigation between the guardian and Mrs. Whitney over an automobile, bank account and partition of the homestead. In all of this Louis was quite active.

In the above we have attempted to set out rather broad outlines of the record to show the background of what followed. Later in this opinion we will set out in detail other parts of the evidence.

Briefly stated, the Whitneys were married March 5, 1936, and lived together continuously until Whitney was taken to the hospital for the insane on October 21, 1949, a period in excess of thirteen years. They lived in the same house all of these years.

III. One of the contentions of defendant is that the court erred in finding that at the time the $10,000 note and mortgage were assigned by the holder, Frank Whitney, to his wife, Addie Whitney, there was a confidential relationship existing between them, and this appearing, the burden was cast upon her to rebut the presumption arising because of such relationship.

To show a confidential relation the burden is upon the plaintiffs herein. Mallow v. Walker, 115 Iowa 238, 88 N.W.

452, 91 Am. St. Rep. 158; Goldthorp v. Goldthorp, 115 Iowa 430, 88 N.W. 944; Johnson v. Tyler, 175 Iowa 723, 157 N.W. 184. It is a fact question. See Utterback v. Hollingsworth, 208 Iowa 300, 302, 225 N.W. 419; Ennor v. Hinsch, 219 Iowa 1076, 260 N.W. 26; Craig v. Craig, 222, Iowa 783, 269 N.W. 743; Albaugh v. Shrope, 197 Iowa 844, 196 N.W. 743. This relationship being shown the burden shifts.

In the case of Arndt v. Lapel, 214 Iowa 594, 600–605, 243 N.W. 605, 609, this court, by Justice Grimm, examined the question at length. In citing many cases, we said: "Moreover, the mere fact that the plaintiff and the grantor were wife and husband does not, of itself, create a legal trust or confidential relationship."

In McNeer v. Beck, 205 Iowa 196, 198, 217 N.W. 825, 826, we said: "Mere blood relationship does not, of itself, create the legal trust or confidential relationship and change the requirement in the above regard." See also Krcmar v. Krcmar, 202 Iowa 1166, 211 N.W. 699; Shaffer v. Zubrod, 202 Iowa 1062, 208 N.W. 294; McKee v. McKee, 190 Iowa 1357, 181 N.W. 672; Klein v. Klein, 239 Iowa 40, 29 N.W.2d 163; Stiles v. Breed, 151 Iowa 86, 130 N.W. 376.

The holding of the cases is that things other than relationship must appear. This relationship may arise from various situations—attorney and client, trustee and cestui que trust, husband and wife, parent and child, physician and patient. 15 C. J. S., Confidential, pages 821, 822.

As we understand the finding of the court it is based upon the ground that at the time of the transfer of the note and mortgage there existed between Frank Whitney and Addie Whitney a confidential relationship. This holding goes to the very essence of the situation. Below we set out the paragraph of the court's finding which seems to sum up its position on that matter:

"The plaintiffs allege and the defendant denies that a confidential relationship existed between Mr. and Mrs. Whitney at the time of and prior to the transaction in question. This seems to the court to be the most important single question in the case. The evidence shows, as recited above, that due to Mr. Whitney's physical condition he was almost completely de-

pendent upon his wife for his existence. Moreover, the record shows that he depended upon her in various other ways. At one place in her testimony Mrs. Whitney states that he relied upon her considerably. After he ceased driving in 1946 she drove him about in his car. When the new car was purchased in 1948 she handled the money. When the business was sold she was present at the various conferences. As hereinbefore stated, Mrs. Whitney made many withdrawals from the bank account, and also took care of the payment of the bills. At various conversations between other people and Mr. and Mrs. Whitney, as detailed in the evidence, it seems that Addie habitually did most of the talking for Mr. Whitney. There is no evidence of any single transaction handled by Frank himself, outside of the presence of his wife. The court feels, and finds, that the evidence and all the circumstances here clearly establish that a confidential relationship existed between the two parties on September 7, 1949, and that as between the two parties the defendant was the dominant one."

Following this we find:

"The court further finds that there are not sufficient facts and circumstances shown in the record, from which it can be found that the assignment in question *was not the result of undue influence,* and that therefore the allegation of undue influence made by the plaintiffs is established by the evidence." (Italics added for emphasis.)

It seems to us from the paragraph last set forth the court had in mind that the burden was that defendant must negative such relationship.

We have studied the record carefully and find ourselves unable to agree with the various statements contained therein. As to Whitney's physical condition—the record shows that while he was not in perfect health, he was up and about and was able to go places. Also the statement that "when the business was sold she was present at the various conferences." We do not find that the record bears out this statement. We quote from the testimony of Doctor Menary, the partner of Whitney:

"I discussed the sale of his business with Mr. Whitney prior

to the sale. He told me that he came to feel that it was time for him to retire on account of his health." Further he said: "In those negotiations Mrs. Addie M. Whitney, the wife of Frank Whitney, did not have any part, that is, in the negotiations leading up to the sale of the business. All she did was to accompany her husband to our office at the time the negotiations were entered into. She was with him at the time this matter was discussed, that is, the final sale of the property. She was present when the contract, plaintiffs' Exhibit 5, was signed by Mr. Whitney. Q. When he came to the place of business to discuss these matters prior to the sale, who brought him? A. Well, that discussion was done during the business day and Mrs. Whitney used to bring him down in the morning and return for him at night to the best of my knowledge, I never have been around that office continuously from day to day or from hour to hour, but I know that she brought him down, was advised that she brought him down and took him home in the later months of his illness."

It is to be remembered that Whitney sold his interest to Menary and he in turn sold one half to Blencoe. It was all one deal and doubtless called for much negotiation.

We find a further statement in the court's findings pertaining to the bank account: "Mrs. Whitney made many withdrawals from the bank account and also took care of the bills."

Let us go to the record. The regular bank account of the Whitneys was in the Peoples Savings Bank of Cedar Rapids, Iowa. The bank statement shows the account of April 23, 1947 was $553.18. It also shows that from April 3, 1947 to December 13, 1948 there was withdrawn from said account approximately $21,452.24 by thirty-nine checks. Thirty of these were made by Frank Whitney and we total them as checking out $19,927.24. The last one signed by Mr. Whitney was on October 28, 1948. Nine were signed by Mrs. Whitney, amounting to $1525.

The above would rather indicate that Frank Whitney was able to look after his business affairs. That Mrs. Whitney paid current bills is certainly not of any material consideration on the question upon which the trial court seemed to rest its finding. It is a matter of common knowledge that in many homes, pos-

sibly a majority, the wife attends to the payment of bills. It is worth mentioning that during the time Whitney sold he had no business except to take care of himself. There would likely be bills for medicine, payments to physicians and hospitals, automobile expense and upkeep, and it goes without saying that it would be perfectly proper for a wife to attend to such matters.

Another statement in that of the court above set forth related to the purchase of the automobile. There is evidence that the matter was talked over between Whitney and his wife and that when the son bought a new one Whitney wanted one—they got one and it became the family car—he rode in it frequently.

Another fact statement by the court is that Mrs. Whitney "habitually did most of the talking for Mr. Whitney." When we examine the record we find little basis therefor, even if it were material. Such is so common in households that it is hardly a matter of comment. At any rate, witnesses for plaintiffs, particularly the children and the wife of his son, testified that on some occasions Whitney did plenty of talking as to various quarrelings and bickerings with his wife.

It is to be remembered that for some years Whitney's health had not been good. During that time he had consulted various physicians, general and special. His diabetes led to cataracts on his eyes and he could hardly read. The evidence shows Mrs. Whitney used to read the papers to him; also articles from the Readers Digest. He seemed to have a lot of faith in medicine and used it at times without the knowledge of Mrs. Whitney or his regular physician, Doctor Keech. He consulted a heart specialist and was given tablets to use when he felt an attack coming on. At times he told folks that he was not getting proper treatment. Defendant regularly talked to Doctor Keech and at his direction she withheld some medicine from her husband. This displeased him and caused some quarrels. According to some of the witnesses of plaintiffs he became apprehensive and self-centered and talked a lot of his own condition. Due to his heart attacks he became apprehensive and quit driving his automobile. Margaret Whitney, wife of Louis, told that on some of Frank Whitney's visits to their home he talked so much of his troubles with his wife that it made her so nervous that her husband told

him to stay away from the home. She stated that on some visits to the Whitney home he talked of his troubles and at times Mrs. Whitney gave her version of the troubles. He would have Doctor Keech called and they would talk over matters together.

We find little in the record to indicate that the defendant was what has been termed by the court a "dominating person" or that she did anything which could be called "overreaching." Nothing appears in the record to show that she was either grasping or avaricious. There is no credible evidence that Mrs. Whitney ever sought to get control of the property of Frank Whitney or made any request or demand that he turn over to her the note in controversy. Her testimony is that in all business matters, banking or otherwise, she followed the instruction and direction of her husband. In judging this matter it must be kept in mind that after the business was sold the Whitneys had no other income save from the bank account and the $10,000 mortgage. Even if Whitney's health had permitted he was getting too old to embark in another business.

On the other hand the record shows that Whitney was a rather forceful individual. He and Menary operated the business for many years together. While they discussed many matters as to its operation, still Whitney did the deciding. Menary put all the money in the partnership in its inception and he evidently trusted Whitney to carry on. Louis, the son, as a witness, said that his father was an individual of a very decided mind and a warm temper, "He would blow up and get it over with. He liked to assert his ideas." Mrs. Whitney said, "He was at the helm and I followed his instructions."

We note that nearly all the testimony in behalf of the plaintiffs was given by Whitney's two children (Louis Whitney, his son, Adeline Kemper, his daughter), Louis's wife, Mrs. Menary and Doctor Sedlacek. An examination of most of this testimony shows that it is directed to the claim of the mental incompetency of Frank Whitney, something which the court did not directly pass upon. Much of such evidence covered the period from the first heart attack until after the transfer. We find that Louis testified at the sanity hearing that he noticed nothing unusual about his father's mental condition until some weeks after the assignment in question.

To us it seems that there is in the record certain evidence on the part of Frank Whitney's children from which one could infer that they did not have a friendly feeling toward the defendant. There is evidence that at times there were arguments between them. It can be inferred that some of these differences arose by reason of certain acts of Whitney's children relating to the care which their father was receiving. It may be a matter of comment that while the children came to visit, sometimes rather infrequently, they did little to help in the care of the father. In effect they listened to the complaints of their father and seemed to take his side of the situation.

Louis and Adeline were "interested" persons and we are to consider their testimony in such light. Both testified that their father and mother were not compatible, constantly quarreling and bickering. We find in the record abundant evidence from disinterested witnesses to the contrary. One of them stated that in the mutual arguments "she [Mrs. Whitney] usually got her way." They placed considerable stress on the fact that the old washing machine at the Whitney home gave out and Mrs. Whitney wanted a new one. The evidence shows that the one they had was thirty years old and that Mrs. Whitney had used it over thirteen years—that it was worn out. Nothing would be more natural than her desire to get a good machine. Evidently the old machine was operated in the basement and defendant wanted one upstairs so that she would be nearer Mr. Whitney at his sick spells and also nearer the telephone, not to mention the fact that the going up and down basement steps was not easy at her age. After the discussion she got the desired machine and went on using it.

A matter which we have not heretofore referred to was the fact that on April 24, 1943, Frank R. Whitney made his last will and testament. That was after he had the first heart attack. In it he gave his interest in the home to his wife and the remainder of his property to her and his two children in equal shares. This will was never changed. This situation seems to have been considered by the trial court wherein it stated that the failure to change the will was such "as to cast a dark and heavy cloud of suspicion upon the transaction." The opinion

then goes on to say: "This is not to say, necessarily, that Mrs. Whitney has been guilty of active fraud." Some other comment along the same line follows and the court went on to say that if the note is to remain the property of Mrs. Whitney, the Whitney children will take nothing. We hardly think the above quoted has anything to do with the case. The will was made years before, when Whitney was in good health and had a good business. His health became such that he doubtless realized that he could not last many years and he very likely realized that with the passing of the years the burden of looking after him and giving him proper attention would be increased. Doubtless he realized the obvious, that they would soon have to live off the slender capital and it would be natural for him to want to reward his devoted wife and give her something to provide for her in her declining years. Her health had been failing due to a kidney removal operation. Many have been faced with a like situation and to call such as casting a "cloud of suspicion" seems to be going to rather extreme lengths. Mrs. Whitney had been a true, devoted and faithful wife for over thirteen years and the heavy burden placed upon her can be best shown by a careful reading of the record. As matters stood the cost of living, medical attention, hospitalization, medicines and the like would within a few years exhaust the whole estate.

Speaking of the conduct of the two Whitney children, it is a matter of note that as soon as they learned that some papers had been signed they became active at once, consulting Mr. Whitney's attorney, the physician, their father, and the defendant.

We hold that the court erred in holding that at the time of the transfer of the note and chattel mortgage there existed a confidential relationship between Frank R. Whitney and Addie Whitney. Such relationship not being shown there is no presumption cast upon the defendant to establish the good faith of the transaction.

The transaction as between Whitney and the defendant was a gift. Matters to be taken into consideration of a gift are whether the gift was reasonable or otherwise and that as to the recipient there should be taken into consideration age, health,

future prospects and the contribution made to the joint accumulation. Brannen v. Brannen, 237 Iowa 188, 21 N.W.2d 459. When Whitney married defendant in 1936 his holdings were small—another financed him in keeping his business going. His wife, the defendant, did her part in keeping things going in the home. For a number of years she raised and sold flowers and the proceeds went to family expenses. It is hardly necessary to say there is a general rule that an individual has the right to dispose of his property in any lawful way of his choosing. In re Estate of Heller, 233 Iowa 1356, 11 N.W.2d 586.

■ The matter of independent advice has been held to be a defense to the claim of undue influence. Curtis v. Armagast, 158 Iowa 507, 138 N.W. 873; Olsson v. Pierson, 237 Iowa 1342, 25 N.W.2d 357. Such advice has been shown in this case. At the time the assignment was made Mr. Fisher was careful to advise Whitney as to the consequences of his act and Whitney stated that he understood.

IV. We have heretofore found that the facts appearing in the record failed to establish the existence of a confidential relationship between Frank Whitney and his wife, the defendant, at the time of the assignment by Whitney to his wife of the Blencoe $10,000 note and mortgage.

■ Where there was no confidential relationship existing the burden of proof at all times would be upon the plaintiff to show undue influence by clear, satisfactory evidence. Osborn. v. Fry, 202 Iowa 129, 209 N.W. 303; Arndt v. Lapel, supra, also on the matter of confidential relationship; Craig v. Craig, supra. The Craig case dealt also with the claim of confidential relationship, the court holding that such relationship not appearing, the burden of proof at all times remained on the plaintiffs to show undue influence by clear, satisfactory and convincing evidence. See also Stonewall v. Danielson, 204 Iowa 1367, 217 N.W. 456; Bradley v. Bradley, 185 Iowa 1272, 171 N.W. 729. In Osborn v. Fry, supra, this court, by Justice Faville, speaking of the term of undue influence said at page 133 of 202 Iowa:

"To be 'undue', the influence must have been such as to destroy the free agency of the testatrix and make her the im-

plement of her husband's craft, and make the instrument executed by her the will of her husband, rather than her own. It must operate to destroy her free agency, not at some time in the past, but at the very time and in the very act of executing the instrument. Solicitations, however importunate, cannot themselves constitute undue influence; for, though these may have a restraining effect, in that they persuade or induce the mind of the testatrix to consent to the thing asked for, they do not destroy her power to freely dispose of her estate. Henderson v. Jackson, 138 Iowa 326. See also In re Estate of Townsend, 128 Iowa 621; Mallow v. Walker, 115 Iowa 238; Sutherland State Bank v. Furgason, 192 Iowa 1295."

See also In re Estate of Mott, 200 Iowa 948, 205 N.W. 770, where we held that the influence to be "undue" must be such as to substitute the will of the person exerting it for the will of the testator; that it must be equivalent to moral coercion and must operate at the very time the will is made and must dominate and control the making of it. Many cases in support of the above rule are cited. See also Worth v. Pierson, 208 Iowa 353, l.c. 360, 223 N.W. 752.

We hold that the plaintiffs' evidence as to undue influence falls short of the necessary showing to establish such claim. Here Whitney was making a gift to his wife of certain property, at least in part the product of their joint efforts. Certainly he was acting within his legal rights in so doing. O'Brien v. Stoneman, 227 Iowa 389, 288 N.W. 447, In re Estate of Kirby, 241 Iowa 340, l.c. Division II, 41 N.W.2d 8, and many cases there cited. See also Haulman v. Haulman, 164 Iowa 471, 145 N.W. 930. The record shows that Whitney for a number of years had had heart attacks and these in connection with his diabetic condition tended to affect his general health. He was constantly under the care of a physician, and to relieve the pain and for his general condition took various medicines. He came and went when able as he desired, sometimes going with other people, more frequently with Mrs. Whitney. He frequently spoke of his condition of health. Years before he had been of a rather rugged type and naturally his inability to carry on when his health deteriorated would give him concern.

We find little in the record to show that defendant sought to exercise any influence upon him which would indicate any desire to cause him to subordinate his will to hers. While there is little in the record to show it, still, in the very nature of things she as his wife would have a right to a voice in their material affairs and she could have a natural desire to expect that her devoted service to him during the many years would not go unrewarded. Outside of the testimony of the Whitney children and the spouse of Louis, there is little evidence to negative the claim of defendant that their married life was happy as between them or that the relationship was compatible.

In this case the evidence is clear and uncontradicted that at the very time the assignment was made by Frank Whitney he was up and about the house; that he had telephoned to Frederick C. Fisher, Jr., an attorney, and a son of his old-time attorney, inquiring when he was coming out to the house. Fisher testified that he had talked over the phone to Mrs. Whitney and Mr. Whitney earlier in the day, the last talk being with Mr. Whitney, about an hour before the assignment was made. Fisher testified that Mr. Whitney, when he talked to him, wanted to know why he was not out there and would he please hurry. We quote further from the testimony:

"It was a beautiful warm, sunshiny fall day and I went to the Whitney home after one o'clock in the afternoon. I drove out there. I parked in the driveway which is right east of the house. I was not quite sure it was the right house, and went to the door; there is a small glassed-in porch on the south, I would say southeasterly corner of the house; Frank Whitney was waiting there for me; I shook hands with him and talked to him very briefly. I had done some traveling during the war and Frank knew it, he apparently had talked to my father, and wanted to know where I had been, and I remarked that it was quite a long story, if I had to repeat the list of places I had been I probably would be there all afternoon; it was the first time I had been out there except for this visit during the war. This conversation took place on the glassed-in front porch. Mrs. Whitney came to the door then and I shook hands with her, and she took me into the living room. I cannot remember whether the front door goes into the living room or the dining

room, but we went into the living room and there I was introduced to some friends of theirs, a Mr. and Mrs. Babcock. I visited with them. Mr. and Mrs. Whitney were there and both Mr. and Mrs. Whitney conversed with the Babcocks and myself for about fifteen minutes."

Fisher further testified that they visited for a time and then the Babcocks said something about going as the Whitneys had some business with Mr. Fisher; that then both Mr. and Mrs. Whitney said, "Oh no, it will take just a minute, please stay"; that following that Fisher and the Whitneys went into the dining room which was connected with the other room with an arched opening; that Fisher sat at a table with Whitney on one side and Mrs. Whitney on the other side. The Babcocks were in the other room and could see some of the persons and could hear parts of the conversation before the signing. Fisher states that the assignment which he had prepared was read over in its entirety by Mrs. Whitney. We quote further from the record:

"Q. Now after the reading of this plaintiff's Exhibit 3, did you say anything to Frank R. Whitney with reference to plaintiffs' Exhibit 3 specifically? A. Yes, I said, 'Now Frank', I said, 'I have to ask you if this is your voluntary act and deed' and he looked kind of puzzled, and I said, 'Well, in other words, no one is making you do this', some remark like that, and he said, 'well, that's right', so then we produced the pen and he started to sign Exhibit 3, and he had quite a deal of trouble with his signature. I had to point out to him the line or place to sign, and he seemed very disgusted about his inability to write his name fluently, and I told him to go ahead and write it entirely himself, that I would not help him with his hand, I think he was trying to conceal his tremor from everyone, he seemed somewhat ashamed of it, and he made a couple of false starts, and he said 'I ought to do that over again', or something, and I said, 'No, Frank, we know that is your signature, I know it, and you know it, and Mrs. Whitney knows it, we are all here and don't you worry about it.' "

Fisher further testified that when the assignment was made, it and the note were laid in front of Mrs. Whitney to his left—

Whitney was on his right; that he went back to the living room and there visited for a few minutes with the Babcocks, Mr. and Mrs. Whitney joining in the conversation. In this connection it might be said that Fisher stated that Mrs. Whitney called before Mr. Whitney did and that in the conversation with her she told him Mr. Whitney wanted to give her the $10,000 note and wanted to know how to do it.

On direct examination Fisher was asked if on that day Whitney appeared mentally alert; if he appeared to understand the nature of his act and what he was doing and what his mental condition was on September 7, 1949. All of the questions were objected to as leading and suggestive, calling for opinion and conclusion of the witness upon a matter upon which he was not shown to be qualified—not asking for a statement of fact. The court directed an answer, subject to objection. We quote a part of two answers to such inquiries: "A. I am absolutely sure that he knew what he was doing when he signed Exhibit 3; if I had felt there was any question about it I believe I would have held the matter up in some way until father could handle it himself."

Frederick C. Fisher, Sr., long-time personal attorney for Frank Whitney, testified as to the relations existing between Whitney and his wife. He had prepared the will for Whitney. He had had charge of the preparation of the various papers when Whitney sold his interest in the business to Blencoe. As to his knowledge of the relations existing between the Whitneys we set out parts of his testimony:

"I am acquainted with Mrs. Addie M. Whitney, and have known her most of her life; I knew her as a girl when she was a schoolgirl, have known her ever since. Mrs. Fisher and I frequently visited the Whitney home and I know that we called out at the Whitney home during the summer of 1949 and probably in the month of August. I have been present during the testimony which has been given both on the part of the plaintiffs and of the defendant and have heard the evidence of the incompatibility and the friction that allegedly existed between Mr. and Mrs. Whitney. Basing my answer on our visits and my acquaintance with Mr. and Mrs. Whitney it was my opinion that they were more than ordinarily compatible, and

that their life together was more harmonious than the average married couple. From my personal observation I know that Mrs. Whitney was very solicitous of his welfare, looked after him, during most of this time his health was deteriorating, and she was very solicitous and careful of his health, and I also discussed the matter with Mr. Frank Whitney himself at different times. Frank Whitney stated to me on frequent occasions that Taddy, which was his pet name for her, had been a wonderful wife and a wonderful nurse, and he could not have carried on without her. I remember at the time the will was drawn, at that time they were both in my office, and I remember that being said in my office in the presence and hearing of Mrs. Whitney, when both Mr. and Mrs. Whitney were present, and those same remarks were frequently made after that time."

Both Mr. and Mrs. Babcock were present in the Whitney living room on September 7, 1949. Part of the testimony relates that they lived in Washington, Iowa; first met Mr. Whitney in 1935; visited back and forth with them from time to time; their visit to the Whitney home on September 7 was a surprise. Babcock had phoned to the Whitney home and Whitney had answered the phone. Later Mrs. Whitney talked to Babcock telling them to come out about 2 p.m., that they had an appointment; that they were there about that time. The Whitneys met them. Whitney was dressed. He and Mrs. Whitney met them and they went into the house and visited. Babcock stated that Whitney seemed anxious to visit; that soon Mr. Fisher came in; Babcock was then visiting with Mr. Whitney. Mrs. Whitney introduced Fisher to the Babcocks. Soon thereafter Whitney spoke of some business, said he "wanted to get this over with and we could visit later"; that the Whitneys and Mr. Fisher went into the dining room leaving the door open. Witness could see them and could hear parts of the conversation. We quote:

"During the first part while they were in the dining room my wife and I were talking and I did not catch the very first of the conversation but I think I got most of it. Q. Well, will you tell the court from what you heard there at that time and place, what you heard out there in the dining room? A. Well, they

read something to Mr. Whitney, and Mr. Fisher said to him, he says, 'Frank, you want to set this aside for Mrs. Whitney?' and he said yes. Q. That is, Frank Whitney said yes? A. That's right. Q. And did Mr. Fisher then make any other remark out there that you heard? A. Yes, when he showed him where to sign he said, 'Now, Frank, this is your will, or your desire', that is in substance, I could not just quote the exact words, and he said it was, he said yes, is what he said. Q. And did they after that then come out of the dining room, did they? A. Yes, they did. They did not stay in the dining room very long after Mr. Fisher made the last remark. I saw Mr. Whitney put his signature on a paper. I did not see the paper. While I was there and before they went into the dining room I don't think that either Mr. or Mrs. Whitney went anyplace to get any papers, I don't think either one of them left the room. I am positive they did not. Mr. and Mrs. Whitney and Mr. Fisher came back into the room from the dining room. When they came back into the dining room Mr. Fisher sort of kidded Mr. Whitney in a sort of a way, told him he was looking good, and so on, something of that kind, and he was not there a great while, he said he would have to be going and he left."

Babcock stated that he and his wife were there about one and a half hours; that they visited during this time. Babcock had known Whitney for years; that he was a diabetic; during the talk Whitney said, " 'I thought I had this thing licked, but I see it is no use. * * * Taddy [Addie] has been a wonderful nurse, she never gives up.' " Witness knew that he had been sick and had lost weight. In substance, witness stated that aside from Whitney's loss of weight and somewhat weakened condition he could see little change in him. As to Whitney's voice, hearing, etc., Babcock said he noticed a slight shaking of Whitney's hand. Mrs. Babcock testified to substantially the same matters her husband testified about and, generally speaking, to the same effect. She had known the Whitneys for years and the families visited back and forth. She stated that in her opinion the Whitneys appeared to be happily married and compatible. Mrs. Babcock testified that the health of Mr. Whitney was not discussed until after Fisher left; that Whitney said

something to the effect that he felt he " 'had this thing whipped.' He did not seem feeble, he seemed to get around. I did not notice that he seemed feeble. He seemed a little weak, but as far as being feeble I could not notice it." Witness said that on that occasion they were in the Whitney home an hour and a half or more. The conversation was general, but thought she and Mrs. Whitney did most of the talking, of trips to the south, etc. Izetta Helbig lived across the street from the Whitneys from 1943 to 1947; met them quite often; first met them in 1943. Mrs. Whitney told witness that "Mr. Whitney was in the hospital suffering from a heart attack"; after he came home they met him—he was in a bed in their dining room—Mrs. Whitney was caring for him and did not have any help around the house so far as the witness had knowledge. We quote from the record:

"Q. Did Mr. Whitney ever make any comment to you with respect to what Mrs. Whitney was doing for him or anything of that sort?

"Mr. Crissman: We object to it as incompetent, irrelevant, immaterial, calling for hearsay.

"The Court: You may answer.

"A. Well, I recall one day especially that Mrs. Whitney had done some unexpected act of kindness to some member of my family, and Mr. Whitney was sitting at the kitchen table in my kitchen, and I spoke about it, and he said, this was his exact words as I remember, he said, 'Well, you know there is no one like Taddy.' "

In this connection we call attention to the testimony of Mrs. A. R. Menary, wife of the executor. On September 7, 1949, she and a son went to the Whitney home after lunch to give Mrs. Whitney a gift. Whitney was sitting on the davenport. She says that "Mr. Whitney was very profuse in his gratefulness of my visit, of our visit" and he paced the room and seemed very nervous. Witness asked if they could do anything for him, etc., that he got emotional. She had known Whitney twenty-eight years. On rebuttal she was asked the following question:

"Q. Now what did you observe as to his mental condition

that day at one o'clock on September 7, 1949, was it normal or otherwise?

"Mr. Randall: Defendant objects to this for the reason that it is calling for the opinion and conclusion of the witness on a matter which she has not shown herself competent to answer, and no foundation has been laid for the asking of such a question, irrelevant, incompetent and immaterial for any purpose, and not proper rebuttal.

"A. Well, other than that he was very nervous, I cannot say.

"Q. Did he seem to be placid and calm or disturbed?

"Mr. Randall: The defendant objects to this for the reason that it is repetitious and leading, irrelevant, incompetent and immaterial for any purpose.

"A. May I answer? I went up to Mr. Whitney and asked him to lie down and he reached up to my arm and said, 'Don't go, stay, please', and then I said to Mrs. Whitney, 'Are we making him nervous?' and Mrs. Whitney said, 'Yes, I think you are', and we stayed possibly half an hour, perhaps an hour, time goes. Nothing was said by Mrs. Whitney as to any visitors that were expected. Mrs. Whitney did say that they were expecting Mr. Whitney's lawyer at 2 or 2:15, I don't remember just exactly; we stayed fifteen minutes from that time, and as I say, I said to Mrs. Whitney, 'Should Mr. Whitney rest?' and she said 'Yes' and we left."

Witness said that Whitney was slow in answering; was thinner and more nervous and very weak and shuffled when he walked—"The conversation was general, possibly in part about his condition, and there was an occasion when he had tears in his eyes."

We hold that even aside from the matter of confidential relationship the evidence fails to show that on September 7, 1949, defendant exercised undue influence over her husband and thereby obtained the assignment to her of the Blencoe $10,000 note and chattel mortgage securing it.

In its conclusions of law the trial court did not pass upon the question of the mental competency of Frank Whitney at the time he made the transfer of the Blencoe $10,000 note to Addie

Whitney. In the opinion filed by the court such matter was mentioned but was not passed upon specifically.

Defendant's appeal sets forth and argues such question. The plaintiffs rather take it up, but in connection with their claim of confidential relationship existing between Whitney and his wife.

In view of our holding hereinbefore set out, that such confidential relationship did not exist when said note was transferred, it possibly is unnecessary for us to pass upon the mental competency of Whitney. However, as both parties have argued the matter we will consider it.

In its findings of fact by the court on the question of the mental condition of Frank Whitney on September 7, 1949, we find the following: "The plaintiffs allege, and the defendant denies, that on September 7, 1949, Mr. Whitney was mentally incompetent."

In the conclusions of law by the court we find the following:

"2. A confidential relationship having been shown to exist, the burden of proof was on the defendant to rebut the presumption of undue influence and overreaching on her part, and to affirmatively establish the good faith of the transaction, and that she took no advantage of Mr. Whitney because of their relationship, but that he acted voluntarily, with freedom, intelligence, and a full knowledge of all the facts. In re: Lundvall's Estate, 46 N.W.2d 535.

"3. That as a matter of law, the defendant has failed to sustain this burden of proof.

"4. That therefore, the assignment in question must be set aside on the ground of undue influence."

In its findings the court summarized the testimony of some of the witnesses on the question of the mental competency of Mr. Whitney on September 7, 1949. Much of this referred to the testimony of the medical witnesses.

For plaintiffs the court calls attention to the testimony of Doctor Sedlacek who first saw Whitney on October 6, 1949, and treated him for several months and until Whitney was adjudged insane. Doctor Sedlacek designated himself as a psychiatrist.

He testified from personal observation of Mr. Whitney that in view of his then condition he was suffering from arteriosclerosis which involved a cerebrosclerosis, and having at that time a definite psychosis; and further that Whitney must necessarily have been mentally incompetent long before September 7, 1949. He testified that psychosis was a form of insanity due to a brain condition.

On the other hand, defendant offered as a witness on that subject Dr. Wilbur R. Miller, a psychiatrist and director of the psychopathic hospital, and professor of psychiatry of the school of medicine at the State University of Iowa. He had been there since about 1944. Doctor Miller never saw Mr. Whitney but based his answer on a hypothetical question wherein certain facts were assumed. He stated that notwithstanding the assumed mental and physical condition as related by Doctor Sedlacek on October 6 Mr. Whitney would not necessarily have deteriorated on September 7, 1949, to the point that he would have been mentally incompetent, in view of the fact that a psychosis sometimes develops suddenly from a background of arteriosclerosis. Then there was the testimony of Doctor Keech who had been the personal physician of and had observed Mr. Whitney for some years. He stated that when he saw him on September 7, 1949, in the morning, Mr. Whitney appeared to him to be mentally competent. The record shows that Doctor Keech treated Whitney from 1943 down to October 6, 1949; also, that he had been in practice at Cedar Rapids for forty years; that he had made a study of mental diseases and had been physician member of the Commissioners of Insanity of Linn County, Iowa, for ten years. During his examination the court asked Doctor Keech his opinion as to whether Frank Whitney on September 7, 1949, was mentally competent.—"A. I think he was competent."

The court then propounded a further inquiry to Doctor Keech whether at that time Frank Whitney appreciated the nature and effect of the assignment in question—"A. Yes, that would be my opinion; also that he would be able to determine the nature of the paper."

It will be noted that this opinion of Doctor Keech was based upon observation that day and in conjunction with his treatment of Whitney for a number of years.

Attorney Fisher, who prepared the assignment and supervised its execution on September 7, 1949, stated that Whitney seemed mentally sound at that time. Also, there are the opinions of Mr. and Mrs. Babcock, old-time friends who were in the Whitney home on that date, that on September 7, 1949, Whitney was mentally competent and understood the nature of the act he was engaged in.

There is in the record considerable evidence bearing on that question—the long-continued illness of Whitney, his hospitalization and the incidents connected therewith, his weakness, impairment of vision, manner of speaking and moving about, inability to clothe himself, irritations, and disputes with Mrs. Whitney arising largely because the giving of medicines and treatment did not suit him. Much of this was given by the children of Frank Whitney.

Plaintiffs in arguing that Whitney at the time was mentally incompetent state that the most important evidence is the signature of Whitney as shown on the assignment (Exhibit 3). Counsel goes on to say that such signature is almost sufficient to condemn the whole transaction. The record shows that for some months Whitney had a shaking of his hand. Some of the witnesses called this condition "palsy." Doctor Miller was asked whether or not the presence of tremor or palsy was indicative of psychosis and he answered that "it is no more indication of psychosis being present than diabetes; that it is the result of arteriosclerosis, not the cause of mental disease." Some of the exhibits bear the signature of Whitney. Many of them down to 1949 are clear and distinct, later ones are such as to indicate that the tremor or palsy of Whitney made the signing difficult. Doctor Miller further testified that a psychosis is simply a term indicating mental disease of a severe nature; that in a majority of cases people can have arteriosclerosis without being affected mentally. Most people have arteriosclerosis as they grow older, and the two often exist separately.

The medical testimony covered a wide range and in some of its phases there was considerable disagreement between the testimony of Doctor Sedlacek and that of Doctor Miller. Possibly the following about the last questions propounded to Doctor

Miller on cross-examination exemplifies the situation: "Q. Men in your profession sometimes disagree with each other, do they? A. Unfortunately."

The burden would be upon the plaintiffs to show the mental incompetency of Frank Whitney when he assigned to his wife the $10,000 note and mortgage of Blencoe.

Where one bases a claim on the alleged mental incapacity he has the burden of so showing. In re Estate of Kirby, supra; In re Estate of Huston, 238 Iowa 297, 299, 27 N.W.2d 26; In re Estate of Heller, 233 Iowa 1356, 11 N.W.2d 586; In re Estate of Klein, 241 Iowa 1103 (Division II), 42 N.W.2d 593; In re Estate of Meyer, 240 Iowa 1226, 1234, 37 N.W.2d 265, 269.

We are of the opinion that the testimony fails to establish the mental incapacity of Frank Whitney at the time he assigned to Addie Whitney the $10,000 note and mortgage. The evidence negatives such claim.

We hold that the court erred in its ruling as hereinbefore set forth and the case is reversed with directions to dismiss petition of plaintiffs with costs.—Reversed and remanded.

MULRONEY, C. J., and BLISS, GARFIELD, WENNERSTRUM, HAYS, and THOMPSON, JJ., concur.

OLIVER and SMITH, JJ., concur in result.